UNITED STATES, Appellee

v.

Shelley S. ROGERS, Lieutenant Colonel
U.S. Air Force, Appellant

No. 99-0838

Crim. App. No. 32711

UNITED STATES COURT OF APPEALS FOR THE ARMED FORCES

Argued April 5, 2000

Decided   November 8, 2000

COX, S.J., delivered the opinion of the Court, in which
CRAWFORD, C.J., and SULLIVAN and GIERKE, JJ., joined.  SULLIVAN,
J., filed a concurring opinion.  EFFRON, J., filed an opinion
concurring in part and dissenting in part.

Counsel

For Appellant: Major Robin S. Wink (argued); Frank J. Spinner (on
    brief).

For Appellee: Major Jennifer R. Rider (argued); Colonel Anthony
    P. Dattilo and Lieutenant Colonel Ronald A. Rodgers (on
    brief).

Military Judge:  James E. Heupel

THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE PUBLICATION.

Senior Judge COX delivered the opinion of the Court.

Appellant was the commander of the 90th Fighter Squadron, which deployed from Elmendorf Air Force Base (AFB), Alaska, to Aviano Air Base (AB), Italy. He stands convicted of disorderly conduct on divers occasions and conduct unbecoming an officer by "wrongfully and willfully develop[ing] an unprofessional relationship of inappropriate familiarity" with First Lieutenant (1Lt) Julie Clemm, a subordinate member of his command.[1] Both offenses were alleged to have occurred at or near Pordenone, Italy, in November and December of 1995.

---

[1] Violations of Articles 133 and 134, Uniform Code of Military Justice, 10 USC §§ 933 and 934. The disorderly conduct charge (Art. 134) was unrelated to the conduct unbecoming charge (Art. 133), and there are no issues before us concerning disorderly conduct. The evidence adduced on that charge revealed

> that on more than one occasion, in the city streets of Pordenone, Italy, the accused walked on the cars of others that were parked along the street. On each of these occasions he did so in the presence of subordinates under his command. On the last occasion, which occurred after an impromptu promotion party, the accused had to be restrained by an officer under his command who observed damage to the vehicles.

United States v. Rogers, 50 MJ 805, 813 (A.F.Ct.Crim.App. 1999). As approved by the convening authority and affirmed by the Court of Criminal Appeals, appellant's sentence is a reprimand and forfeiture of $2,789 per month for 4 months.

We granted review of these issues:

I

WHETHER THE AIR FORCE COURT OF CRIMINAL
APPEALS ERRED BY UPHOLDING CHARGE II AND THE
SPECIFICATION THEREUNDER (ALLEGING AN
UNPROFESSIONAL RELATIONSHIP UNDER ARTICLE
133) BECAUSE THE SPECIFICATION WAS
UNCONSTITUTIONALLY VAGUE WHEN IT FAILED TO
IDENTIFY A RELEVANT CUSTOM OR REGULATION
WHICH PROHIBITS RELATIONSHIPS BETWEEN
OFFICERS.

II

WHETHER THE AIR FORCE COURT OF CRIMINAL
APPEALS ERRED BY UPHOLDING CHARGE II AND THE
SPECIFICATION THEREUNDER (ALLEGING AN
UNPROFESSIONAL RELATIONSHIP UNDER ARTICLE
133) BECAUSE THE SPECIFICATION FAILED TO
IDENTIFY SPECIFIC ACTS WHICH CONSTITUTED AN
UNPROFESSIONAL RELATIONSHIP AND AS SUCH
FAILED TO STATE AN OFFENSE.

III

WHETHER THE EVIDENCE IS LEGALLY INSUFFICIENT
TO FIND APPELLANT GUILTY OF CHARGE II,
WILLFULLY DEVELOPING AN UNPROFESSIONAL
RELATIONSHIP WITH 1LT CLEMM.

Being a court with only legal review authority, Art. 67(c), Uniform Code of Military Justice, 10 USC § 867(c), we review facts in the light most favorable to the prevailing party below. It is not our function to reweigh evidence and determine guilt or innocence anew. In the case of legal sufficiency of the evidence, our standard of review is "whether, considering the evidence in the light most favorable to the prosecution, a

reasonable factfinder could have found all the essential elements beyond a reasonable doubt." United States v. Turner, 25 MJ 324 (CMA 1987); see Jackson v. Virginia, 443 U.S. 307, 319 (1979). Further, "[i]n resolving legal-sufficiency questions, . . . [we are] bound to draw every reasonable inference from the evidence of record in favor of the prosecution." United States v. Blocker, 32 MJ 281, 284 (CMA 1991).

## The Evidence

The 90th Fighter Squadron deployed to Italy on October 4, 1995, with eight F-15E's and twelve 2-man crews. The mission was "to maintain around the clock presence over [the] top of Bosnia." There had been "multiple air strikes" on Bosnia the week prior to the 90th's arrival. The 90th was flying combat missions over Bosnia. Generally, they worked 6 days on and 2 days off. As the off-days rarely coincided with calendar weekends, the off-days were known as "virtual weekends," comprised of "virtual Saturdays" and "virtual Sundays."

Appellant first met 1Lt Clemm at an Officers' Club in Korea, in April or May 1995, while the 90th was in Korea on temporary duty. She was interested in a position in his squadron, and he approved her application. 1Lt Clemm arrived at Elmendorf AFB about the time the squadron was deploying to

Italy.  She joined the squadron in Italy on November 18, 1995, about a month and a half into the operation.

Captain (Cpt) Laurie Lovrak also met 1Lt Clemm in Korea in about May 1995.  Cpt Lovrak became 1Lt Clemm's sponsor, in effect, as she processed into the squadron, and Cpt Lovrak preceeded 1Lt Clemm to Italy.

In Italy, Cpt Lovrak briefed 1Lt Clemm, among other things, on who was who in the squadron and who to watch out for.  As Cpt Lovrak explained in her testimony:

> Basically, I was pointing out for her
> individuals.  For example, happily married
> aircrews on whom she could rely for
> professional, platonic support.  Also
> pointing out to her members that might have
> ulterior motives in seeking a close
> friendship with her.  I was concerned for
> her welfare.

Cpt Lovrak warned 1Lt Clemm against hanging around and drinking with the aircrews.  As she testified:

> I talked about my experiences in the fighter
> squadrons and tried to point out to her that
> the aircrews who drink together are
> perceived as, you know, the good old boys,
> but we're females in Ops [Operations], and
> when we join them, we look like promiscuous
> lushes and that's the way we're viewed,
> especially if we're returning the
> flirtations.  There is a double standard
> that is unfortunate, but I said don't allow
> yourself to get in that position, you're
> walking a dangerous line.

Cpt Lovrak knew in Korea that 1Lt Clemm was married.  Apparently 1Lt Clemm's marriage was failing, although no action

5

had been taken to institute divorce proceedings.  In Italy, 1Lt Clemm held herself out as single.

November 21, 1995--three days after 1Lt Clemm arrived in country--was a virtual Saturday, and a Thanksgiving party was organized for the entire squadron.  The party was held at a hotel near Caorle, Italy, well to the south of Aviano AB on the Adriatic coast.  This was the hotel in which the enlisted members of the squadron were quartered, and in which the officers had been quartered until just previously.  At the time of the party, the officers were newly quartered in a hotel in the town of Pordenone, about an hour to an hour and a half by car from Caorle, and much nearer to the air base.

After dinner, a large number of the enlisted personnel went down to the beach for a bonfire, but some of the officers and enlisted people remained behind in the hotel bar.  It was at this point that numerous members of the squadron began to notice behavior that caused concern.

Cpt Lovrak noticed that, at dinner, 1Lt Clemm had been drinking "excessively, and at the bar she continued to drink excessively."  This surprised Cpt Lovrak, "based on our previous--my previous observations and our conversations."  1Lt Clemm "became very physically flirtatious with aircrews at the

bar, particularly Major (Maj) Cloutier.[2] Both of them were behind the bar."

Cpt Lovrak painted the scene:

> She [1Lt Clemm] had, at this point, removed her outer sweater and Major--there was probably room just barely for two people to stand behind the bar, between the bar and the back mirrors. She--Major Cloutier was in back of her. She stood with sometimes a drink in each hand or a drink in one hand, a cigarette in the other, or a cigarette in each hand, and pushed back against him, pressed against him, turned around and had her hands all over his chest. Major Cloutier was making it apparent, I mean, very blatant attempts to sidestep her and get around her, but she would find her way to that very same position.

Cpt Lovrak declined to join the party at the bonfire. As she testified:

> The situation was beginning to deteriorate. It was obvious that people were growing very disgusted with what was going on at the bar, including enlisted personnel that were still standing around. Major Moore and I attempted to get Lieutenant Clemm to come back to the hotel with us and she didn't want to, so I left with Major Moore.

At some point, Maj Cloutier noticed that 1Lt Clemm was behind the bar with appellant mixing drinks. Maj Cloutier testified that "[t]hey were standing in very close proximity to one another." Maj Cloutier "stayed there to monitor the

---

[2] Maj Michael A. Cloutier was the deployed Director of Operations, or second in command.

7

situation.  It was an uncomfortable situation for me, because there were still several maintenance [enlisted] individuals present, as well as some of my officers."  Maj Cloutier was not alone in this concern.

Eventually, the remaining contingent at the bar began to trickle down to the beach.  Maj Hume[3] had previously noticed that appellant and 1Lt Clemm "had struck up a rapport during dinner, is the best way to describe it."  At the beach, he noticed that "they came down to the bonfire together, significantly later than most everyone else. . . .  They were engaging people in conversation like they were a couple together at a social function, side-by-side, you know, talking to different people in groups and that sort of thing."  Hume testified that "[t]he discussion at the bonfire was that the boss was drunk and we didn't really want him to, you know, pickup on the Lieutenant and make a mistake there."

When Cpt Lange[4] noticed appellant and 1Lt Clemm at the bonfire, he noticed that appellant "had his arm around Lieutenant Clemm's waist."  "[H]e had his arm down around her lower waist and their bodies were, you know, they were hip-to-hip."  Cpt Lange "felt like there was a relationship being

---

[3] Major David B. Hume was a Flight Commander and an Assistant Operations Officer for the 90th.

[4] Cpt Douglas E. Lange was the Squadron Electronic Warfare Officer.

developed there that was inappropriate," in that appellant was the commander and she a subordinate. A number of the officers were discussing the situation, and Cpt Lange hastened to offer 1Lt Clemm his coat, saying, "Lieutenant, you must be cold. Here, take my coat." Appellant declined it, and they moved closer to the fire. Cpt Lange was especially concerned because there were about 20-25 enlisted personnel at the bonfire.

Maj Durtschi[5] and Cpt Morgan[6] both saw appellant with his arm around 1Lt Clemm's waist at the bonfire. Cpt Morgan saw them "coming out of the darkness." It struck him "that they were walking very close to each other, together, bodies touching pretty much all the way down, and [appellant] had his hand tightly around her waist." Cpt Morgan was talking to Cpt Hughes[7] at the time and exclaimed, "Hey, look at that." Cpt Morgan and Cpt Hughes discussed which "one of us was going to have to tell [appellant] to stop doing this in front of the enlisted troops."

Cpt Hughes, being a flight commander, was elected. He approached appellant and pulled him away from 1Lt Clemm on the

---

[5] Maj James W. Durtschi was an F-15E pilot and an Assistant Director of Operations.

[6] Cpt Eric Morgan was an F-15E pilot.

[7] Cpt Steve D. Hughes was a Flight Commander and considered himself a very good friend of appellant--"as close to a friend as a subordinate can be to a commander." Appellant acknowledged that Cpt Hughes was a friend.

pretext of needing to talk to him about an operational matter. Appellant was reluctant to separate and asked Cpt Hughes if it "could wait." Cpt Hughes replied, "No, sir, I need to talk to you about it now." Cpt Hughes kept appellant away from 1Lt Clemm for about 20 or 30 minutes. As they were finishing the discussion, Cpt Hughes told appellant, "Sir, I think you should kind of keep your distance from Lieutenant Clemm around here, several of the guys have noticed." Appellant acknowledged, in his testimony, that Cpt Hughes had warned him on that occasion that "[t]hat girl is bad news."

Eventually, the bonfire broke up and the officers prepared to return to their quarters at Pordenone. There were nine officers remaining, and two small vehicles. Appellant climbed into the rear seat of his car with 1Lt Clemm.[8] To Maj Cloutier's knowledge, appellant had never sat in the back of his own vehicle before. Cpt Lange was sufficiently concerned about what he had seen that he tried to get into the back seat and get between the two of them. But Maj Cloutier, who undertook to drive, dissuaded him, saying that he would "handle the situation."

Back at the Park Hotel in Pordenone, a group of officers gathered in Maj Cloutier's room on the second floor. The first

---

[8] The squadron had a small number of vehicles. One was assigned permanently to appellant; the others were shared.

10

to arrive was 1Lt Clemm, whose room was directly across the hall. She wanted to smoke a cigarette with Maj Cloutier. Minutes later, they were joined by Majs Durtschi and Hume and Cpts Morgan and Lange.

When Cpt Hughes got back to the hotel, he rode up on the elevator with appellant. Cpt Hughes and appellant were the only members of the squadron billeted on the fourth floor of the hotel. After the third floor, Cpt Hughes and appellant were the only people on the elevator. Once they were alone, Cpt Hughes reiterated his earlier warning to appellant. He told him, "Sir, you know I wouldn't--I'd just kind of go into your bed and not hang around Lieutenant Clemm anymore." Appellant responded, "Yeah, but she would look really good with my dick in her mouth."[9] Cpt Hughes advised him once more against seeing her. Then he made sure that appellant went into his room and closed the door. Finally, Cpt Hughes went into his room and went to bed.

About that time, Maj Durtschi was in the hall outside Maj Cloutier's room on the second floor. He heard 1Lt Clemm's phone ring and saw her go into her room to answer it. Maj Durtschi

---

[9] Regarding the elevator incident, appellant testified, "I do not remember riding with Captain Hughes up the elevator. I have a lot of trust in Captain Hughes. I have no reason to believe that he's lying. I have no explanation for how that came about."

11

heard 1Lt Clemm say into the phone, "Yes, you can come down, there are other guys here and we're in [Maj Cloutier's] room." Moments after that conversation, appellant appeared with a bottle of wine and two glasses. He nodded to everyone, sat down with 1Lt Clemm, and poured a glass of wine for the lieutenant and one for himself. Appellant and 1Lt Clemm stayed in the room for 30-45 minutes and then left, one after the other. The remaining officers commenced discussing, for about an hour, the problem that was becoming apparent to them that evening.

The virtual weekend of November 21-22 marked a change in the life of the 90th Fighter Squadron. Thereafter, many officers began noticing that appellant and 1Lt Clemm were spending a great deal of off-duty time together. Maj Hume testified that, after that weekend, "[t]hey spent time together, riding to and from work, and going to the gym, that sort of thing." Maj Hume saw them drive to work together "maybe five or six times," and he saw them leave to go to the gym "two or three times." Maj Hume noted that the previous Intel Officer, a male, did not ride to work with the commander.

Cpt Morgan saw them together on "numerous occasions, on a pretty much daily basis." This included "[r]iding in the same car to work quite a bit, apparently going to the gym to workout, going to lunch, dinner, et cetera. Just on a fairly regular basis." To Cpt Morgan, the quantum of their togetherness seemed

12

"improper . . . or unusual."  Other officers noted similar sightings.

Maj Moore[10] described himself as a born-again Christian, a fact purportedly well known in the squadron.  He once observed a degree of physical contact between appellant and 1Lt Clemm in the gym, in which appellant was apparently helping the lieutenant with chin-ups, that Maj Moore thought was compromising and made him feel uncomfortable.  So much so, that he "tried to walk back into the room and make a joke of it to kind of break the tension, because it was uncomfortable for me, and I was in another room."  Maj Moore also noticed that appellant "wasn't as available as he normally was," that occasionally he was "hard to find."

Maj Cloutier, the second in command, noticed the difference acutely.  He had been "joined at the hip" with his boss up until the Thanksgiving party.  After that, he was "filtered out of the picture."  Whereas before the party, Maj Cloutier rode back and forth to work with appellant, after the party, Maj Cloutier "got to drive home with other people."  In the week after the Thanksgiving party, Maj Cloutier was approached by several of his officers "indicating . . . that they thought there was a problem occurring between Lieutenant Clemm and [appellant]."

---

[10] Maj William A. Moore was the Systems Operations Officer during the deployment.

13

Maj Cloutier was trying "to quell the situation," and saw that his "responsibility is to first take care of my boss." He hoped that the Thanksgiving situation was simply a result of too much alcohol, and that it was "just a minor occurrence at that time."

The next virtual weekend was November 29-30. As it happened, on the afternoon of the 28th, an EA6 "took the barrier" at Aviano and closed down the base. Two of the 90th's planes returning from sorties with "live ordnance" were diverted to a nearby, non-U.S.-operated base. Appellant assigned Majs Cloutier and Moore to work the weekend and to manage the return of the aircraft. Appellant wanted a maintenance crew to fly to the other base to check the planes before they took off, but weather prevented the helicopters from flying and kept the maintenance crew at Aviano on the 29th. It was not until the 30th that the planes were recovered.

On the morning of the 29th, a virtual Saturday, Maj Durtschi was off duty, walking in the city of Pordenone. Appellant and 1Lt Clemm, in civilian clothes, were driving alone in a vehicle and they "stopped [Maj Durtschi] on the sidewalk." According to Maj Durtschi, the three of them "had a little chat,

and they said they were going to the base to do errands."[11]

At some point that day, Maj Cloutier called appellant on his cell phone to update him on the progress of recovering the two planes.  Appellant indicated on the phone that "we are in Maniago knife shopping."  Maj Cloutier did not ask who "we" was.[12]  Maj Moore also talked to appellant on the phone and confirmed that appellant had said he was in Maniago.

Later that day, in the early evening, Maj Cloutier called appellant back as it was beginning to be clear that they would not be able to get their planes back that day.  This time, appellant said that "we are now up in the mountains in a bar."[13]  Again, Maj Cloutier did not inquire who "we" was.

When Maj Cloutier returned to the hotel that night, he knocked loudly on 1Lt Clemm's door.  She did not respond.  He repeated this the next morning when he was heading back to base to try to recover the planes.  Again, she did not answer.  Maj

---

[11] Appellant had originally been planning a solo trip to Rome that weekend, but called it off the day before.  Whether his decision not to go to Rome was made before or after the aircraft diversion was not clarified in the record. 1Lt Clemm was also scheduled to go to Rome that weekend, but in conjunction with an organized trip.  She also cancelled her trip.

[12] Appellant denied being in Maniago, saying that "we" were in Maniago, or being with 1Lt Clemm at the time.  He testified that he was driving alone and he "could see a Maniago sign," a town a short distance from Aviano.  He was indicating that he did not have any idea where he was.

[13] Appellant denied making this statement.

Cloutier did not see 1Lt Clemm or appellant around the squadron or the hotel that entire virtual weekend.[14]

On the virtual Sunday of that weekend, Majs Cloutier and Moore were again back at base working on recovering the aircraft. Maj Cloutier again called appellant to apprise him of the situation. First, he called appellant's hotel room and got no answer. Then he tried appellant's cell phone and reached him, at about 9 a.m. Appellant said that "it was such a beautiful day, that we decided to drive back up into the mountains again."[15]

On another occasion, identified only as occurring in "early December," Maj Hume had evening duty and called appellant on his cell phone regarding a maintenance matter. After the necessary discussion was concluded, appellant said, "Hummer, I'm up here in the mountains. I'm over an hour away from base, and I'm looking at the stars with a beautiful woman and it's great." Maj Hume noted that appellant "sounded pretty happy."[16]

By early December, rumors were rampant among the aircrews, and the morale of many was plummeting. Maj Hume testified that "the rumor mill was just out of control as far as, you know,

---

[14] Maj Cloutier was 1Lt Clemm's immediate supervisor during the deployment.

[15] Appellant testified that he was at a resort area that day, alone.

[16] Appellant's explanation for the statement was, "I was alone in my car, on the perimeter of the base when I made the statement, and it was jokingly."

'Have you seen them together?'  'What have they been doing together,' that sort of thing.  I mean it was the talk of the town."  Maj Hume added: "My observations were that people were going to [appellant] trying to tell him to knock off the alleged affair, and that they weren't well received."  Cpt Lange testified: "It surprised me that he would do something like this that could have such an effect on his career.  It really generated a lack of trust in him, which I felt lowered morale in the squadron."  Cpt Morgan testified:  "I'll say how I personally felt that the morale went downhill.  There's a large trust factor that's associated with a commander and those that follow on.  And I felt that trust had been violated . . . ."  Cpt Hughes testified that morale "was at an all time low.  I'd never--actually, I haven't been in that many squadrons, but I'd never seen a squadron, you know, that disbursed [sic], especially when you have a mission like we had over there to do."  Maj[17] Grahn characterized the morale as "definitely going downhill fast."  It bothered him because, "we were in a combat situation and if guys were not paying attention to what they were doing, somebody is going to get hurt pretty quick."

---

[17] Maj James A. Grahn, a captain at the time of appellant's misconduct, was Assistant Operations Officer and Squadron Weapons Officer for the 90th.

In addition to being concerned about what appellant was doing to his career, the officers knew that the aircrews were talking to their wives back at Elmendorf, and that the matter could not long be contained.

December 4 did not fall on a virtual weekend, but that was the day word was received in the squadron that appellant had been selected for Colonel (O-6). Appellant was flying that night, so Maj Cloutier organized the usual fighter pilot sort of reception. As he explained:

> I arranged for a fire truck to meet him. We were going to douse him down when he got out of the airplane. On his arrival, I had everybody stand at--the entire maintenance organization, plus the officers, standing at attention. I had the--it was dark out, so we had the big lights set up with the fire truck right there. As the aircraft pulled in, his aircraft pulled in, everybody went to attention and gave him a salute as he came in.

Champagne followed the dousing.

Walking back to the squadron area, Maj Hume asked appellant, "Sir, are you doing Lieutenant Clemm?" Appellant replied, "No, Hummer, I'm not doing her." But Maj Hume testified that "he looked away from me and looked down with--the best way that I can describe it is a shit-eating grin."

The promotion celebration picked up again later at an establishment near the officers' hotel. On the way back to the

18

hotel after the party, the first of the car-walking incidents occurred.  See n. 1, supra.

Back at the hotel, the officers continued to try to protect their commander.  As Cpt Hughes explained it:

> [I]t was Captain Grahn that was--we just didn't really assign anybody, he just said "I'm going to take [appellant] back to his room."  And Major Cloutier said, "I'll make sure Lieutenant Clemm gets back to her room," because the impression was throughout the squadron that there was something going on between the two of them.  We were going to make sure that they got back to their rooms that night.

Up in appellant's room at about 2:30-3:00 a.m., Cpt Grahn brought up the subject of appellant's relationship with 1Lt Clemm.  Appellant asked Cpt Grahn if he thought he was sleeping with her.  Cpt Grahn replied:

> I said it really didn't matter what I thought.  I replied that my impression was that he was sleeping with her, and the impression was--really what I was trying to get across to him, was the important thing, that these days we've had a few commanders that--I said we had a few commanders that had been court-martialed or whatever, for inappropriate behavior, inappropriate contacts, and I wanted to make sure he knew that I thought this situation was inappropriate.  I just wanted to let him know, so he'd know that.

Asked what appellant's response was to his concerns about the relationship, Cpt Grahn testified:

> He never really told me that it was appropriate or inappropriate, or that he was

19

> sleeping with her or he wasn't sleeping with
> her.  It was more of a, you know, kind of
> treating me like a mother hen, kind of
> attitude.

At about that point, appellant's phone rang; it was 1Lt Clemm.  Appellant told her, "No, Cubes [Cpt Grahn] is here giving me massive shit," and he ended the conversation quickly. After they hung up, Cpt Grahn pointed out to appellant that that was an example of what he was talking about, "a Lieutenant calling an O-6 in his room at three o'clock in the morning." Appellant brushed him off.[18]

Meanwhile, that night, a group of officers had gathered in Cpt Walgren's room.  Maj Cloutier was summoned, and the conversation ranged from training issues and topics of the day to appellant's relationship with 1Lt Clemm.  The decision was made to bring appellant into the conversation.  The officers felt that they needed to take care of their boss, that things had gone far enough and they needed to confront him directly. When appellant arrived, they confronted him with their perceptions.  Appellant reacted angrily and defensively.  The officers were shocked at his response, and he ultimately walked

---

[18] Maj Grahn testified about another time the subject of appellant's relationship with 1Lt Clemm came up between them.  At one point, appellant held up a book and said, "Hey, Cubes," and showed him the title.  It was "International Affairs."  Maj Grahn got the joke.

20

out on the conversation.  Relations between appellant and those officers became exceedingly chilly from that point on.

The next day, December 5, brought two events of consequence.  First, Maj Durtschi rotated back to Elmendorf.  There he was confronted by Lieutenant Colonel (LtCol) Donisi, who asked him "who had hooked up with Lieutenant Clemm."  Maj Durtschi "didn't answer right away," but ultimately he revealed that it was appellant.

Second, concluding that confronting appellant had been fruitless, Maj Cloutier decided to try to confront the other party, 1Lt Clemm.  He testified that, in a 5-minute conversation, he warned her about the perceptions that had arisen.  1Lt Clemm promptly told appellant that Maj Cloutier had accused her of having an affair with appellant.  Appellant was not happy that Maj Cloutier had confronted 1Lt Clemm.

By December 6, relations between appellant and Maj Cloutier were exceedingly icy.  That evening after dinner, the two of them had it out.  Appellant announced that he was not pleased with "any of the individuals that confronted me about this situation," and that he was going "to make a few changes in this squadron."  Maj Cloutier reviewed the bidding; he explained "why the perceptions are developing, what his actions were that generated such things, and that we were trying nothing more than

21

to protect him."  Apparently, the conversation was lengthy and vehement, on both sides.

Ultimately, Maj Cloutier felt he had begun to get through to appellant, and the two of them "settled back down from what was a very tense situation, to more of a comfortable situation." The conversation became "just a frank discussion."  Eventually, appellant handed Maj Cloutier a poker chip with the squadron's emblem (the "Pair-O-Dice") on it.  Appellant said to Maj Cloutier, "Here, cash this in in five years, and I'll tell you all about the relationship between the two of us [1Lt Clemm and himself]."[19]

Relations between Maj Cloutier and appellant did not improve, however.  Maj Cloutier and others had additional confrontations with appellant about the continuing relationship, and there was an additional car-walking incident.  Generally, appellant would not even talk to Maj Cloutier, his second in command.

Maj Cloutier was "very dejected" that he "could not get through" to appellant.  The situation was "eating [Maj Cloutier] up," because he felt that "[he was] the one that [was] responsible for taking care of the situation, and [he was] not

_____

[19] Coincidentally or not, the statute of limitations was 5 years.  Art. 43(b)(1), UCMJ, 10 USC §843(b)(1).  Appellant, as a commander, might be expected to know that.

able to resolve the situation."  Early in the morning of December 15, after the second car-walking incident had occurred, Maj Cloutier called LtCol Donisi at Elemdorf.  He told LtCol Donisi that he could no longer work for appellant, and he asked LtCol Donisi to help him find a new job.

After concluding the phone call, at about 5:30-6:00 a.m., Maj Cloutier, in uniform, stepped out of his room into the hall of the hotel to go to work.  He noticed that 1Lt Clemm's door across the hall was ajar and that her room key was lying on the floor.  Knocking and looking into the room, he saw that the bed appeared not to have been slept in.  Backing out of the room, he saw 1Lt Clemm coming down the hall toward him.  As he testified: "She is in civilian attire, in her socks, with jeans and a T-shirt, and her hair is still a mess, like she has just gotten up."

Caught red-handed sneaking back to her room, 1Lt Clemm confessed to Maj Cloutier that she was having an affair with appellant.[20]  She expressed remorse about the relationship,

---

[20] This admission on December 15, and the following one on December 16, were initially suppressed by the military judge on confrontation and hearsay grounds.  Appellant had originally been charged with adultery, but after these admissions were suppressed, the Government withdrew that charge.  Subsequently, 1Lt Clemm was called by the members as a court witness, under a grant of testimonial immunity.  She denied admitting an affair to Maj Cloutier, and testified that the substance of these conversations was quite different.  Thereafter, the Government was permitted to introduce the statements as prior inconsistent statements, for impeachment purposes, accompanied by appropriate limiting instructions.  Since the evidence was admitted as a prior inconsistent statement, we have not considered Maj

mentioning that she had recently seen the officers' wives' newsletter and read the portion written by appellant's wife; and "she had felt badly about that." She pledged to Maj Cloutier that she would talk to appellant about ending the relationship.

It was not until the next evening, December 16, that Maj Cloutier had a chance to talk to 1Lt Clemm. As Maj Cloutier testified:

> I inquired, I said, "Well, how did it go?"
> I said, "Did you have an opportunity to
> speak with [appellant] today?" She said,
> "Yes." I said, "Well, how did it go?" She
> said, "Well, not too well." She said, "I
> went up there last night to talk to him
> about it, and I ended up sleeping with him
> again."

Maj Cloutier said, "Julie, you've got to be kidding me." 1Lt Clemm responded, "Well, when I was leaving this morning, I told him that this should. . . we probably need to knock this off." However, she related that appellant replied to her that he was "not willing to make the commitment not to have the relationship anymore." 1Lt Clemm also indicated that she was changing hotel rooms.

The next morning, December 17, Maj Cloutier discovered that 1Lt Clemm had moved up to the fourth floor, next door to appellant's room. 1Lt Clemm had not coordinated the move with

---

Cloutier's testimony for any other purpose, but rather have limited our review of his testimony to 1Lt Clemm's credibility as a witness.

the squadron-billeting officer; rather, she made her own arrangements through the hotel staff. 1Lt Clemm would have been well aware that Cpt Reesman, one of the pilots, was also the billeting officer and that he made the room assignment for the squadron, because she assisted Cpt Reesman in that capacity when the officers moved into the hotel.[21]

Also on December 17, Cpt Hughes made another effort with his friend, appellant. As Cpt Hughes explained the situation:

> Things were obviously not going well in the squadron. Here we were. The United Nations troops were just coming into Bosnia. The feeling at the time was that things could flare up over the air responsibility at any time. And there was a definite lack of focus on the part of most--I'd say all the aircrew, in dealing with the threat that was perceived out there. That was directly related to what was going on or perceived to be going on, between the Commander and the Intelligence Officer [1Lt Clemm].

Cpt Hughes continued:

> Eventually we [Cpt Hughes and appellant] went to the gym and we ended up back in his room. It was eight thirty or nine. Went up to have a couple of beers and talk about it. I approached the subject with him, by saying that I was worried about his career, which I definitely was. I was worried about him as, you know, his subordinate, and also as a friend, and I was worried about the squadron

---

[21] Cpt Reesman was "involved in the same ministry" as Maj Moore and, like Maj Moore, did not take part in the drinking and partying activities of the squadron. The significance of 1Lt Clemm's decision to bypass Cpt Reesman in relocating her room was likely not lost on the members.

> and what was going to happen to us, if this continued.
>
> So, that's how I approached the subject with him. We talked--talked about various things for two to three hours. Two thirds of it was about what was going on in the squadron. He never said that he had been sleeping with Lieutenant Clemm. He never said that he hadn't been sleeping with her. He asked me what he thought I should do [sic]--he asked me what I would do if I were him, to try to correct the situation. And I told him that I think--I told him I think Major Cloutier's heart is in the right place, that he has the best interest of the squadron in mind, that those two should get together, talk about this as Commander and DO, figure out how to deal with the situation, and then deal with it. Probably it would involve either [appellant] or Lieutenant Clemm going back to Alaska. And once that--they're apart, then everything would probably defuse and we'd go about our business.

Asked how appellant responded to the suggestion that one of them go back to Alaska, Cpt Hughes testified: "Not very well. He didn't like it, didn't like that option at all." Instead, appellant blamed the entire situation on Maj Cloutier's manipulations and deceit.

For Maj Cloutier, 1Lt Clemm's move to the fourth floor was the straw that broke the camel's back. With appellant and 1Lt Clemm "now rooming side-by-side with one another," Maj Cloutier felt "that it's going to break loose," that he himself "will receive retribution for not doing [his] job of reporting it." Maj Cloutier called a meeting of the officers "closest

26

associated with what was going on, because during this entire time, we had tried to keep it very, very quiet." Maj Cloutier told the officers that he was "completely out of ideas on how to handle this situation, and that [he] was considering going forward with the allegations."

At the conclusion of the meeting, Maj Cloutier decided to go forward with the allegations. He contacted the appropriate higher authorities, and on December 18, presented the information in his possession. Appellant was relieved of his command on December 19, 1995, pending an investigation into allegations of engaging in "an unprofessional relationship." But the saga does not end here.

Maj Moore was detailed to assist appellant in moving out of the hotel immediately, and to escort him on the plane to Elmendorf. Maj Moore described the conversation on the airplane:

> He offered bits and pieces of information.
> Some of it was that she [1Lt Clemm] had some
> affairs or something in the past. The
> conversations were broken because he was,
> you know, under a lot of thought. He said
> that she'd had an affair with Klute[22] at one
> point, it was--Major Cloutier, excuse me.

---

[22] "Klute" was apparently Maj Cloutier's call sign. There is no assertion, even from 1Lt Clemm, that she had had an affair with Maj Cloutier. Given the short duration that she knew Maj Cloutier, it is inconceivable on this record that this particular assertion, if indeed accurately related, was correct.

Asked whether appellant had said anything regarding the squadron, Maj Moore continued:

> Well, he did make a comment that kind of--I wouldn't say it alarmed me, but he said he didn't know how deep he and Donna would have to go to right this or to--how deep he would have [to] dig into the squadron affairs. Something about this may be "me and Julie against the whole Air Force by the time it's all over." He told me the results would be earth-shattering.[23]

Cpt Lovrak had departed Italy on December 2 and returned to Elmendorf. She was called back to Italy to escort 1Lt Clemm back to Elmendorf. After they arrived back in Alaska, 1Lt Clemm called Cpt Lovrak "about ten to 12 times. She initiated the phone calls." According to Cpt Lovrak, 1Lt Clemm

> often called late at night, but the one occasion she called me very late, and very distraught. . . . She was crying. . . . She talked about the, you know, the sort of --some of the legal issues that were pending, without being very specific. Talked about her arguments with her parents, and was very quiet for a moment. Then she blurted--she blurted out, "You warned me about Major Cloutier, but you didn't warn me about [appellant]."

Regarding the reference to appellant, Cpt Lovrak testified, "It was--boy, it was one of those statements that is so pregnant

_____

[23] Maj Moore was asked about another conversation he had had with appellant at some point in the deployment. The O.J. Simpson verdict had been announced, and appellant asked Maj Moore if he believed "God viewed all sin as equal in his eyes." Maj Moore responded, "Yes." Appellant continued, asking "whether or not, for example, is murder and adultery on equal basis in God's eyes[?]" Maj Moore responded affirmatively, that he believed it was.

with meaning."  Cpt Lovrak did not follow up and pursue the statement, however, because she had been advised by the Legal Office "to make a wide berth around any specifics regarding this case."  She had been instructed not to ask questions, but to "change the subject" and "move on," and she did.

Regarding the reference to Maj Cloutier, Cpt Lovrak clarified that she had not, in fact, warned 1Lt Clemm about him. She told 1Lt Clemm that "Major Cloutier loves to party and loves women, but I never cautioned her, you know, that he would come on to her.  I would never have expected him to come on to Lieutenant Clemm, and she never gave me any indication that he had."

Issue I

Was the Specification Vague?

Appellant contends that the specification of Charge II, alleging conduct unbecoming an officer, was vague in that it "failed to identify a relevant custom or regulation which prohibits relationships between officers."

In its entirety, Article 133, UCMJ, 10 USC § 933, provides:

Any commissioned officer, cadet, or midshipman who is convicted of conduct unbecoming an officer and a gentleman shall be punished as a court-martial may direct.

Thus, by its terms, Article 133 contains no requirement of proof of violation of a service regulation or custom. Reference to para. 59, Part IV, Manual for Courts-Martial, United States (1995 ed.)(conduct unbecoming an officer), in effect at the time of the underlying conduct at bar, produces a similar conclusion.[24]

Indeed, in the instant case, the specification of Charge II did not allege that appellant had violated a service regulation or custom. It alleged:

> In that LIEUTENANT COLONEL SHELLEY S. ROGERS, United States Air Force, 90th Fighter Squadron, at or near Pordenone, Italy, did, between on or about 20 November 1995 and on or about 18 December 1995, wrongfully and willfully develop an unprofessional relationship of inappropriate familiarity with First Lieutenant Julie Clemm, a subordinate under his command, which conduct under the circumstances was unbecoming an officer and a gentleman.

Tailoring his instructions on the elements to the allegations, the military judge instructed the members as follows:

---

[24] In contrast, a charge of "fraternization" (the improper association of an officer and an enlisted servicemember) under Article 134 requires proof of violation of a "custom of the accused's service that officers shall not fraternize with enlisted members on terms of military equality." Para. 83, Part IV, Manual for Courts-Martial, United States (1995 ed.); see generally United States v. Johanns, 20 MJ 155 (CMA 1985). Similarly, a charge of violating a lawful regulation under Article 92, UCMJ, 10 USC § 892, requires proof of a violation of a "punitive" regulation. See United States v. Shavrnoch, 49 MJ 334, 336 (1998).

In the Specification of Charge II, the accused is charged with the offense of conduct unbecoming an officer and a gentleman. In order to find the accused guilty of this offense, you must be convinced by legal and competent evidence, beyond a reasonable doubt, that:

One, between on or about 20 November 1995 and 18 December 1995, at or near Pordenone, Italy, the accused wrongfully and willfully developed an unprofessional relationship of inappropriate familiarity with First Lieutenant Julie Clemm.

Second, First Lieutenant Julie Clemm was a subordinate under the command of the accused.

And third, under the circumstances, the accused['s] conduct [was] unbecoming an officer and a gentleman.

Further, the military judge defined certain key terms and phrases as follows:

"Conduct unbecoming an officer and a gentleman" means behavior in an official capacity, which in dishonoring or disgracing the individual as a commissioned officer, seriously distracts or detracts from his character as a gentleman, or behavior in an unofficial or private capacity, which in dishonoring or disgracing the individual personally, seriously detracts from his standing as a commissioned officer.

"Unbecoming conduct" means behavior more serious than slight, and of a material and pronounced character. It means conduct morally unfitting and unworthy, rather than merely inappropriate or unsuitable, misbehavior which is more than opposed to good taste or propriety.

31

> "Unprofessional relationships" are those
> personal relationships between officers,
> which result in inappropriate familiarity or
> create the appearance of favoritism,
> preferential treatment, or impropriety.
> Unprofessional relationships create the
> appearance that personal friendships and
> preferences are more important than
> individual performance and contribution to
> the mission.  The term "unprofessional
> relationships" refers not to any one
> specific occurrence, but to the totality of
> the circumstances.  Not all contact or
> association between and [sic] a superior
> officer and a subordinate officer is an
> offense.  Whether the contact or association
> in question is an offense, depends upon the
> surrounding circumstances.

In Parker v. Levy, 417 U.S. 733, 752, 757-58 (1974), Article 133 survived a claim that it was "'void for vagueness' under the Due Process Clause of the Fifth Amendment and overbroad in violation of the First Amendment."  The Supreme Court noted that our Court and other military courts had "narrowed the very broad reach of the literal language of the articles [Arts. 133 and 134], and at the same time ha[d] supplied considerable specificity by way of examples of the conduct which they cover."  Id. at 754.  The Court cited approvingly our invocation of Colonel Winthrop's venerable observation on conduct unbecoming an officer:

> To constitute therefore the conduct here
> denounced, the act which forms the basis of
> the charge must have a double significance
> and effect.  Though it need not amount to a

32

> crime, it must offend so seriously against
> law, justice, morality or decorum as to
> expose to disgrace, socially or as a man,
> the offender, and at the same time must be
> of such a nature or committed under such
> circumstances as to bring dishonor or
> disrepute upon the military profession which
> he represents.

William Winthrop, Military Law and Precedents 711-12 (2d ed.
1920 Reprint); see 417 U.S. at 753-54.

The Supreme Court acknowledged, however, that "[i]t would
be idle to pretend that there are not areas within the general
confines of the articles' language which have been left vague
despite these narrowing constructions." Id. at 754. Where
"areas of uncertainty as to the coverage of the articles . . .
remain[ed]," the Court added that "further content may be
supplied . . . by less formalized custom and usage." Id.
(emphasis added). Nothing in the opinion intimated that proof
of a custom or usage was a requirement.

On the other hand, the Supreme Court noted "there is a
substantial range of conduct to which both articles clearly
apply without vagueness or imprecision." Id. And the Court
made it clear that an officer charged with an Article 133
offense must have fair notice that his or her conduct was
punishable. 417 U.S. at 755-57. Although there have been
occasional hints by some judges of our Court that proof of a
service custom or regulation may be a requirement of Article 133

33

prosecutions generally, e.g., United States v. Kroop, 38 MJ 470, 473 (CMA 1993), that view, as then-Chief Judge Sullivan noted, "has not commanded a majority of this Court," with the possible exception of officer-enlisted "fraternization" cases charged under Article 133, instead of Article 134. United States v. Boyett, 42 MJ 150, 159 (1995)(Sullivan, C.J., concurring in the result).

In the instant case, there is no question that appellant was on notice of what sorts of relationships were impermissible. Albeit it was an apparently nonpunitive regulation, an Air Force Instruction in effect at the time of the charged conduct proscribed, and gave examples of, unprofessional relationships. It stated:

> Relationships in the Same Chain of Command, the Same Unit, or a Closely Related Unit. Personal relationships between members of different grades or positions within an organization or chain of command can easily become unprofessional. Dating and indebtedness commonly get out of hand because they appear to create favoritism or partiality. Consequently, senior members should not date or become personally obligated or indebted to junior members. This is also because seniors have, or are perceived to have, authority to influence the junior member's career.[25]

Paragraph A1.3.1., AFI 36-2909 (20 Feb. 1995)(emphasis added).

---

[25] We decline to attempt to walk a line between "dating" and the evidence adduced at appellant's court-martial.

34

Further, as commander, appellant had occasion to both discuss and apply the standards relating to personal relationships. Cpt Lovrak testified that she and appellant had had "several" professional discussions on the subject, even before the deployment to Italy, particularly concerning a relationship that involved a senior noncommissioned officer. Appellant acknowledged in his testimony having "many discussions of professionalism" with Cpt Lovrak, "each one may have been related to another act or incident." Appellant also had to deal with at least one relationship matter in Italy, involving enlisted members within 1Lt Clemm's intelligence section.

In sum, the granted issue asks whether the specification was unconstitutionally vague in failing to allege violation of a regulation or custom of the service which forbade a relationship such as his and 1Lt Clemm's. The Constitution, however, does not require that a regulation or custom of the service be established.

Obviously, there will be many gradations of relationships and associations between servicemembers that will not put the parties fairly on notice that the conduct might be inappropriate. However, as the Supreme Court suggested in Parker v. Levy, supra, there is certain conduct to which Article 133 "clearly appl[ies] without vagueness or imprecision." 417 U.S. at 754. Under the circumstances of this case, we are

35

satisfied that appellant's conduct falls into this latter
category.  See United States v. Frazier, 34 MJ 194 (CMA 1992).
Any officer would be on notice that this type of behavior was
punishable.  We hold that the granted issue is without merit.


## Issue II

### Failure of Specification to Identify Acts Which
### Constituted the Unprofessional Relationship

Appellant's misperception of this issue represents more
than a matter of mere semantics.  The conduct appellant was
charged with was "wrongfully and willfully develop[ing] an
unprofessional relationship of inappropriate familiarity."  The
"acts" appellant refers to did not "constitute" the
relationship, they evidenced it.

In regard to the evidence of the "acts" that was to be
proffered at trial, appellant was well on notice.  A Bill of
Particulars, produced in limine by the prosecution, outlined the
core events and evidentiary matters the Government intended to
introduce.  Although necessarily abbreviated, the fullness of
their significance could hardly have failed to resonate in that
the defense had previously been provided a copy of the 4-volume
Article 32, UCMJ, 10 USC § 832, Investigating Officer's Report.
This document contained both the sworn pretrial statements and

the summarized or verbatim testimony of all of the Government's significant witnesses.

Taken in conjunction with the Bill of Particulars, the Government had disclosed, in essence, all of the evidence it possessed in order to prove the nature of the relationship. This granted issue is without merit.

Issue III

Legal Sufficiency of Evidence

As previously indicated, it is not our function to reweigh evidence and determine guilt or innocence anew. Rather, our responsibility is to ascertain whether the finder of fact had a legally sufficient basis to reach the conclusion it did. Indeed, as pertained to virtually every evidentiary matter presented by the prosecution, the defense either denied the act or statement, or presented it with a different content and meaning. The court members,[26] however, apparently found the credibility of appellant and 1Lt Clemm to be insufficient even to raise a reasonable doubt as to guilt. We, in turn, are satisfied that the evidence presented by the prosecution was enough that "a reasonable factfinder could have found all the

---

[26] This particular panel was comprised of seven colonels and a lieutenant colonel, all on loan from other installations and commands.

37

essential elements beyond a reasonable doubt."  United States v. Turner, supra; Jackson v. Virginia, supra.

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

United States v. Rogers, 99-0838/AF

SULLIVAN, Judge (concurring):

I agree with the majority's resolution of the granted issues. Long ago, in my separate opinion in United States v. Boyett, 42 MJ 150, 160-61 (1995) (Sullivan, J., concurring in the result), I concluded that a custom or regulation was not constitutionally required for a valid prosecution under Article 133, UCMJ.  I said:

III
FAIR NOTICE THAT CONDUCT VIOLATED
ARTICLE 133

47.  The second issue in this case is whether appellant was provided fair notice that his conduct was a crime under Article 133.  Clearly, Parker v. Levy, [417 U.S.] at 755-57, 94 S.Ct. at 2561-62, provides that at least constructive notice of the criminality of a servicemember's conduct is required by the Due Process Clause of the Fifth Amendment.  Such notice can be shown by proof of an authoritative court decision including such conduct as punishable under Article 133; a provision of the Manual for Courts-Martial explaining conduct as a violation of Article 133; or a custom of the service prohibiting such conduct or any other circumstance which would establish that a servicemember would have no reasonable doubt that his conduct was unbecoming an officer.  Id.  In United States v. Johanns, 20 MJ at 161, this Court simply held that Captain Johanns in 1982 did not have adequate notice from any of the above sources or anywhere else that his conduct was proscribed under Article 133.

Those circumstances exist in this case, where appellant's conduct with a female subordinate officer clearly undermined his status as head of his squadron.  See United States v. Frazier, 34 MJ 194 (CMA 1992) (officer undermined his ability to lead by open and overly familiar relationship with enlisted man's wife).  An obvious leadership failure existed in this case, which was not only observed by subordinates but was expressly called to appellant's attention by them.  Accordingly, appellant's prosecution for this Article 133, UCMJ, offense was constitutionally proper.

<u>United States v. Rogers</u>, No. 99-0838

EFFRON, Judge (concurring in part and dissenting in part):

For the reasons set forth below, I agree that the Charge, in light of the bill of particulars, was sufficient to state an offense and provide fair warning of the criminality of the conduct at issue. I do not agree that the evidence was sufficient to prove the offense alleged.

I. Legal Sufficiency of the Charge

Article 133, UCMJ, 10 USC § 933, proscribes "conduct unbecoming an officer and a gentleman." The Supreme Court, in <u>Parker v. Levy</u>, 417 U.S. 733, 756 (1974), indicated that such a statute might be void for vagueness under the standards applicable to criminal offenses in the civilian sector. The statute could be sustained in the military context, however, so long as the person had received "fair warning of the criminality" of his or her conduct. The Court relied in significant part on the decisions of this Court and the language in the Manual for Courts-Martial that had "narrowed the very broad reach of the literal language of the articles, and at the same time ha[d] supplied considerable specificity by way of examples of the conduct which they cover." <u>Id</u>. at 753-54. The Court also noted that "further content may be supplied . . . by less formalized custom and usage." <u>Id</u>. at 754. The guidance in the Manual for Courts-Martial plays a vital role in the

assessment of the legality of the Charge.  With respect to the offense of conduct unbecoming an officer and a gentleman under Article 133, the Manual notes:

> There are certain moral attributes common to the ideal officer and the perfect gentleman . . . . Not everyone is or can be expected to meet unrealistically high moral standards, but there is a limit of tolerance based on customs of the service and military necessity below which the personal standards of an officer, cadet, or midshipman cannot fall without seriously compromising the person's standing as an officer, cadet, or midshipman or the person's character as a gentleman.  This article prohibits conduct by a commissioned officer, cadet, or midshipman which, taking all the circumstances into consideration, is thus compromising.

Para. 59c(2), Part IV, Manual for Courts-Martial, United States (2000 ed.).  The Manual reflects traditional military law. Winthrop, in his authoritative treatise, noted with respect to an earlier version of the statute:

> Though it need not amount to a crime, it must offend so seriously against law, justice, morality or decorum as to expose to disgrace, socially or as a man, the offender, and at the same time must be of such a nature or committed under such circumstances as to bring dishonor or disrepute upon the military profession which he represents.

William Winthrop, Military Law and Precedents 711-12 (2d ed. 1920 Reprint) (footnote omitted).

2

United States v. Rogers, No. 99-0838/AF

The comments by the President in the Manual and Winthrop in his treatise reflect two tiers of disciplinary infractions under military law.  The first tier includes matters that amount to flaws or deficiencies in performance or conduct that are not crimes, either in the traditional or uniquely military sense.  See generally United States v. Wheatley, 10 USCMA 537, 28 CMR 103 (1959)(careless or thoughtless act of officer not necessarily criminal).  Infractions not amounting to UCMJ offenses may be addressed through administrative measures, such as those listed in RCM 306(c)(2), Manual, supra, and the Discussion thereunder.  The second tier includes matters that not only involve deficiencies in performance or conduct, but which also constitute offenses under the UCMJ.  These matters can be dealt with either under the UCMJ or through administrative actions.  See RCM 306(c)(1)-(5), 401-04, and 407.

The Manual expressly addresses the subject of officer-enlisted relationships in paragraph 83, Part IV (Fraternization), providing a basis for differentiating between those relationships that are punishable under the UCMJ and those that are either permissible or that may be addressed solely through administrative measures.  The Manual, however, does not provide similar guidance with respect to the relationships between officers of different grades.

3

United States v. Kroop, 38 MJ 470 (CMA 1993), is our most recent precedent governing relationships between officers of different ranks. Kroop involved a charge of "undue familiarity" and "excessive social contacts" between a married male lieutenant colonel (LtCol) and a married female second lieutenant detailed to his squadron. LtCol Kroop pled guilty to the Charge but challenged the findings on appeal. The Court of Military Review affirmed the findings only insofar as the Charge pertained to adultery and set aside that portion of the findings concerning "undue familiarity" and "excessive social contacts." 34 MJ at 634-36. The Judge Advocate General certified the case to our Court.

The opinion of Senior Judge Everett, joined by Judge Wiss, addressed two aspects of the Charge. First, it stated that "[i]n the absence of further allegations as to the details of the conduct involved or the service custom violated, we are concerned about the imprecision of this language." 38 MJ at 472. Second, it noted that in 1989, at the time of the charged conduct, "no custom of that service" and "no Air Force Regulation prohibited such conduct." Id. at 473. Judges Everett and Wiss concluded that neither Article 133 nor Article 134 was violated by "private sexual intercourse between an officer and his or her superior, unaccompanied by any element of harassment or coercion on the part of the superior and any

4

allegation of violation of an applicable custom or regulation . . . ." Id.

Chief Judge Sullivan concurred in part and in the result, limiting his views to agreement with a comment by Senior Judge Everett that the language excised by the Court of Military Review could be viewed as "surplusage" in the context of an adultery charge. Id.

Judge Gierke, in dissent, stated that the allegation of "undue familiarity" and "excessive social contacts" with a married female servicemember was sufficient to state an offense under Article 133. He noted: (1) the case involved a guilty plea in which the accused had not challenged the sufficiency of the specification at trial; (2) under those circumstances, the standard of review as to legal sufficiency was lower on appeal than in a case where the specification had been challenged at trial; and (3) the accused had not asked for a bill of particulars or in any way asserted at trial that the specification was too vague. Id. at 474-75.

Judge Cox expressed agreement "with almost everything" in Judge Gierke's dissent, but he concurred in the result because he viewed the decision of the Court of Military Review as doubting that "this particular conduct was of such a character as to rise to conduct unbecoming an officer." Id. at 473.

5

In view of the split opinions in Kroop and the fact that it was viewed as involving private behavior, it does not provide a precedent that would clearly govern the present case. At a minimum, Kroop suggests that pleading and proof of a custom or regulation, or production of a bill of particulars, may be sufficient to rebuff a challenge to such a specification in a contested case.

Subsequent to our decision in Kroop, the Air Force revised Instruction (AFI) 36-2909, entitled "Fraternization and Professional Relationships," effective February 20, 1995. The parties to the present case agree that the 1995 version of the Instruction was non-punitive, in the sense that violations were not punishable under Article 92, UCMJ, 10 USC § 892 (failure to obey a lawful order or regulation).

With respect to officers, the 1995 Instruction defined "[u]nprofessional [r]elationships" as "[p]ersonal relationships between officers . . . which result in inappropriate familiarity or create the appearance of favoritism, preferential treatment, or impropriety." Para. A1.1.2. With respect to officers within the same chain of command, unit, or closely related unit, the Instruction noted:

> Personal relationships between members of different grades or positions within an organization or chain of command can easily become unprofessional. Dating and indebtedness commonly get out of hand

6

>           because they appear to create favoritism or
>           partiality.  Consequently, senior members
>           should not date or become personally
>           obligated or indebted to junior members.
>           This is also because seniors have, or are
>           perceived to have, authority to influence
>           the junior member's career.

Para. A1.3.1.  The Instruction also defined fraternization (officer-enlisted relationships) and noted that fraternization was subject to criminal prosecution under the UCMJ as service discrediting and prejudicial to good order and discipline. Para. A1.1.3.  No such language was included with respect to unprofessional relationships between officers; rather, the Instruction simply noted that such relationships "become a matter of official concern." Para. A1.3.2.[1]

The current version of AFI 2909 (1 May 1999), issued subsequent to the events at issue in this appeal, contains a more detailed description of the nature of unprofessional relationships.  In addition, the new Instruction indicates that commanders will use "a stepped approach to enforcement of the policy" regarding unprofessional relationships.  Id. (Summary of

---

[1] Paragraph 2 of the Instruction directed commanders to take the following "corrective action" with respect to relationships having an adverse effect on their units:

>           2.1 Consider administrative actions . . . .
>           2.2 Consider punitive action, when appropriate,
>           especially for favoritism, partiality, or misuse of
>           grade or position, which may be violations of the
>           Uniform Code of Military Justice (UCMJ).
>           Fraternization is a violation of the UCMJ.

Revisions). Under the stepped approach, a commander first will issue an order "to cease an unprofessional relationship"; then, if the officer does not adhere to the order, the commander will consider "prosecution under the UCMJ for violation of the order." Para. 4. The two-step approach is reinforced in paragraph 8 of the Instruction, "Actions in Response to Unprofessional Relationships," which provides that corrective action

> should normally be the least severe necessary to terminate the unprofessional aspects of the relationship. The full spectrum of administrative actions is available and should be considered. . . . Experience has shown that counseling is often an effective first step in curtailing unprofessional relationships. . . . An order to terminate a relationship, or the offensive portion of a relationship, can and should be given whenever it is apparent that lesser administrative action may not be effective. Officers or enlisted members who violate such orders are subject to action under the UCMJ for violation of the order.

This current Instruction reflects a recognition by the Air Force that it is difficult to provide a definitive set of rules governing the wide variety of personal interactions between officers of different ranks, and that an order can serve to focus the attention of an officer on the limits of his or her relationships with particular subordinates.

In a case such as this, where there has been a bill of particulars, it is not necessary to address the question of whether the specification, standing alone, provides sufficient notice that the conduct in question was proscribed by Article 133. Instead, it is appropriate to look at the bill of particulars in conjunction with the guidance in the Instruction, the Manual, case law, or custom.

During the initial stages of the trial, the defense moved to dismiss the specification at issue on the grounds that it failed to state an offense. The Government responded by furnishing a bill of particulars.[2]

---

[2] The bill of particulars identified the following circumstances in support of the Charge:

1. Testimony surrounding the 21 November 1995 Thanksgiving party in Caorle, Italy. This includes the ride back to Pordenone, Italy, statements made by the accused in the elevator to Captain Hughes and the subsequent gathering in Major Cloutier's hotel room.

2. Observations in November and December 1995 from members of the squadron concerning frequency of off-duty contacts between the accused and his subordinate Intelligence Officer, 1Lt [First Lieutenant] Clemm.

3. Testimony that the accused and 1Lt Clemm spoke to each other on the telephone from their respective hotel rooms in the middle of the night on more than one occasion.

4. Lt Clemm's statements to Major Cloutier admitting to having an affair with the accused and her inability to stop the affair.

5. Testimony from various squadron personnel concerning their perceptions of the accused and 1Lt Clemm as they pertain to confrontations with the accused and his reactions to their confrontations.

6. Statements that 1Lt Clemm made to Captain Lovrak that "you warned me about [other aircrew] but you didn't warn me about LtCol Rogers."

7. Statements made by the accused to Major Cloutier concerning the "dice poker chip."

The centerpiece of the bill of particulars was item 4, the allegation that 1Lt Clemm admitted to Major Cloutier that she was having an affair with appellant. The balance of the bill of particulars involved circumstantial evidence from which inferences could be drawn corroborating the existence of an affair and its negative impact on the command.

The bill of particulars was more than sufficient to provide adequate notice of conduct unbecoming an officer and a gentleman. Whatever limits there may be on the reach of Article 133 into discreet, private conduct, the circumstances referenced in the bill of particulars were well within the range of conduct proscribed by military law. I am confident that no field grade officer holding a position of command in any of the armed forces could have reasonably believed in 1995 that he or she would not risk a court-martial for having an affair with a subordinate junior officer under the circumstances described in the bill of particulars.

8. Statements by the accused while on his cellular phone to Major Hume that he was in [the] mountains with a beautiful woman, and a statement to Major Cloutier that "we" are in the mountains.

9. Major Durtchi's observations of the accused and 1Lt Clemm riding in a car together on a non-duty day in civilian clothes.

10. Failure of the accused to advise 1Lt Clemm to have her room changed again when he discovered that she had moved into the room next to his.

## II. Legal Sufficiency of the Evidence

A bill of particulars may provide the basis for sustaining the legal sufficiency of a charge, but it does not address the legal sufficiency of the evidence actually introduced on the merits.  At trial, 1Lt Clemm denied that she had been involved in an affair with appellant, and she denied making a statement to Major Cloutier admitting to such an affair.  As a result, the only evidence of her statement was Major's Cloutier's assertion that 1Lt Clemm had, in fact, made such an admission.

The military judge ruled that Major Cloutier's recollection of her statement constituted hearsay that was inadmissible on the merits of the Charge, although he permitted it to be used, under proper limiting instructions, as a prior inconsistent statement to impeach 1Lt Clemm's trial testimony denying the affair.  See Mil. R. Evid. 613, Manual, supra.  Because it was excluded as substantive evidence on the merits, her statement may not be considered during appellate review of the question whether the evidence was legally sufficient to support the charged offense.

Absent her admission, the remainder of the prosecution's case consisted of a variety of incidental touchings, social encounters, warnings to appellant about the impact of his interactions with 1Lt Clemm on the discipline and morale of the unit, and appellant's actions in response to those expressions

11

of concern.  Without her admissions, the evidence reflected the speculation of others as to the possibility of an inappropriate relationship, but did not provide a legally sufficient basis upon which a reasonable factfinder could have conluded, beyond a reasonable doubt, that appellant's conduct with 1Lt Clemm crossed the line from permissible interaction to an illegal unprofessional relationship of inappropriate familiarity.  See United States v. Turner, 25 MJ 324 (CMA 1987), citing Jackson v. Virginia, 443 U.S. 307, 319 (1979).

That conclusion, however, does not mean that the Air Force was precluded from holding appellant accountable for his conduct.  Aside from the plethora of administrative actions that could have been taken with respect to matters such as efficiency reports, assignments, and promotions, appellant could have been held accountable in a court-martial for the offense of dereliction of duty under Article 92 or as a related charge under Article 133.  The evidence makes abundantly clear that, from the outset of appellant's interactions with 1Lt Clemm, members of his command repeatedly called his attention -- as squadron leader -- to the deleterious impact of these interactions on the good order and discipline of the unit. Although these admonitions were brought to appellant's attention with increasing frequency and bluntness, he not only chose to ignore these expressions of concern -- but he also willfully

12

engaged in conduct that further undermined the morale of the unit, a unit actively engaged in combat operations. As squadron leader, he had a particular responsibility to set an example. Instead of conducting himself in a manner that would ensure that his interactions with 1Lt Clemm were limited to those necessary for their professional relationship, he repeatedly placed himself in situations which affected morale within the unit and which caused reasonable concern among the officers and enlisted members of his unit. Rather than making it clear to his subordinates that his relationship with 1Lt Clemm was confined to professional interaction, he inflamed the situation through comments suggesting that he viewed her as a sexual object rather than as a military officer.

This is not a case of an isolated remark in a private conversation, nor does it involve a stray, careless or thoughtless act. It also does not involve a relationship in which the parties endeavored to act with discretion and circumspection. The case before us involves a commanding officer who -- knowing of concerns within his unit about his relationship with a subordinate -- repeatedly acted with flagrant disregard of the consequences upon his unit that would result from his remarks and his visible interactions with that subordinate.

13

Under the circumstances of this case, I would have had no difficulty in concluding that a reasonable fact-finder could have found that appellant did not conduct himself as an officer and a gentleman when he permitted the degradation of the morale, good order, and discipline of his unit by taking actions that further aggravated the reasonable concerns of members of his unit and that had been repeatedly called to his attention. Given the way the case was charged and prosecuted, however, it would be difficult to hold that a dereliction charge would be fairly embraced within the Charge. In light of the Government's decision to center its prosecution on the existence of an inappropriate relationship rather than on appellant's dereliction of duty, I would dismiss the Charge and remand the case for a rehearing on sentence.