IN THE CASE OF


UNITED STATES, Appellee

v.

Michael C. BROWN, Captain
U.S. Air Force, Appellant

No. 00-0295

Crim. App. No. 32906

United States Court of Appeals for the Armed Forces

Argued October 11, 2000

Decided September 14, 2001

EFFRON, J., delivered the opinion of the Court, in which SULLIVAN and GIERKE, JJ., joined.  SULLIVAN, J., filed a concurring opinion.  CRAWFORD, C.J., and BAKER, J., each filed an opinion concurring in part and dissenting in part.


Counsel


For Appellant: Major Stephen P. Kelly (argued); Lieutenant Colonel James R. Wise (on brief); Colonel Jeanne M. Rueth.


For Appellee: Captain James C. Fraser (argued); Colonel Anthony P. Dattilo and Lieutenant Colonel Ronald A. Rodgers (on brief); Captain Melissa A. Burke.



Military Judge: Patrick C. Rosenow



**THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE PUBLICATION.**

Judge EFFRON delivered the opinion of the Court.

A general court-martial composed of officer members convicted appellant, contrary to his pleas, of one specification of disrespect toward a superior officer and six specifications of conduct unbecoming an officer, in violation of Articles 89 and 133, Uniform Code of Military Justice, 10 USC §§ 889 and 933. He was sentenced to dismissal and confinement for 14 days. The convening authority approved these results, and the Court of Criminal Appeals affirmed in an unpublished opinion.

On appellant's petition, we granted review of the following issues:

I

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION IN DENYING APPELLANT'S REQUEST FOR A SPECIAL INSTRUCTION TO ENSURE A PROPER VERDICT BY A VOTE OF TWO-THIRDS OF THE MEMBERS.

II

WHETHER THE MILITARY JUDGE ERRED BY ADMITTING AIR FORCE PAMPHLET 36-2705 ("DISCRIMINATION AND SEXUAL HARASSMENT") WHICH PREJUDICIALLY INVITED THE MEMBERS TO CONSIDER OFFICIAL "AIR FORCE POLICY" IN ADJUDGING FINDINGS AND SENTENCE.

III

WHETHER VARIOUS SPECIFICATIONS OF CHARGE II AND THE ADDITIONAL CHARGE ARE SUPPORTED BY LEGALLY INSUFFICIENT EVIDENCE.

We hold that the military judge did not err with respect to Issue II. With respect to Issue III, concerning the legal sufficiency of the evidence, we affirm in part and reverse in part for the reasons set forth below. Issue I is moot in light of our disposition of Issue III.

## I. BACKGROUND

This case involves the relationships among four Air Force nurses -- appellant, Captain (Capt) TT, Capt LK, and First Lieutenant (1Lt) VC. At the time of the incidents at issue, the four nurses were assigned to the 42nd Medical Group, Maxwell Air Force Base (AFB), Alabama. Appellant was serving in the grade of captain as an operating room nurse and assistant supervisor of the operating room. He was married, had one child, and had served nearly 10 years on active duty, including 6 years of service as a commissioned officer in the Air Force. Capt TT, a female nurse with 4 years of service, also worked in the operating room. Capt TT was a First Lieutenant for most of the period during which she worked with appellant and was promoted near the end of the period encompassing the charges. Appellant was her assistant supervisor throughout most of this period. Capt LK, a female nurse anesthetist on her first assignment in the Air Force, worked in the operating room. 1Lt VC, a female nurse also on her first assignment, initially worked on the

Medical Surgical Floor and subsequently was assigned to the operating room.

Capt TT met appellant when she was assigned to the operating room in April 1995. Approximately 10 months later, she mentioned to the operating room supervisor, Lieutenant Colonel (Lt Col) B, that appellant had made personal comments that she considered to be offensive. The record is unclear as to precisely when Capt TT brought this matter to Lt Col B's attention. Lt Col B responded by discussing the following options with Capt TT: he could address the situation in his supervisory capacity or he could allow Capt TT to handle it by herself. According to Lt Col B, he offered Capt TT the option of addressing the matter informally on her own because he thought that "maybe they were just having a personality problem." Neither Capt TT nor Lt Col B treated this as a formal complaint requiring official action, and neither brought these concerns to appellant's attention.

In March 1996, appellant had a discussion with Capt TT and other operating room personnel regarding the procedure for counting medical instruments. Appellant noted that Capt TT had made an incorrect count on the previous evening, and reminded everyone present of the accountability procedure required by hospital policy. Capt TT, who believed that her counting method was superior, was embarrassed because appellant singled her out

4

for criticism.  She became defensive and asked appellant to discuss the issue in private.  The conversation escalated into a shouting match.

Soon thereafter, on March 22, Capt TT decided to call upon Lt Col B and provide him with the details of her personal interactions with appellant over the past 10 months, but he was not in his office.  She then returned to the recovery room and had a conversation with 1Lt VC, the substance of which is a matter of dispute.  Capt TT testified that 1Lt VC initiated a conversation about appellant, asking, "How can you stand to work with him?"  1Lt VC specifically contradicted Capt TT's recollection.  1Lt VC denied making the remark, and instead expressed her belief that Capt TT was prompted to approach her as a result of the dispute over counting medical instruments. Both agree, however, that they discussed appellant's conduct. The two nurses then met with Lt Col B and related incidents during the past year that they viewed as inappropriate.  Neither Capt TT nor 1Lt VC advised Lt Col B, at that time, of the dispute concerning the medical instruments.  Capt TT also had a separate conversation with Lt Col B during which she advised him that appellant, an African-American, had accused Lt Col B, a Caucasian, of racism.

As a result of his conversation with Capt TT and 1Lt VC about their interaction with appellant, Lt Col B became

5

concerned that they had raised a sensitive issue for the Air Force and the Department of Defense that was "out of [his] league" and that had to be addressed "in light of Air Force policies on harassment." He reported his concerns to higher authorities, which resulted in a formal investigation.

In the meantime, Lt Col B learned of the dispute about counting medical instruments. He met with appellant on March 28 to discuss that dispute and an unrelated staffing matter. He did not mention the information he had received from Capt TT and 1Lt VC about their personal interaction with appellant. According to Lt Col B, appellant remained calm throughout the conversation. Twenty minutes later, however, appellant returned and called Lt Col B a racist, complained that Lt Col B was soliciting lies about him, and threatened to file a complaint with the Inspector General.[1]

At about 5:45 a.m. the next morning, appellant asked Lt Col B if he could go home early because he had worked the previous night. Lt Col B told him he could not leave at that time. Appellant returned shortly thereafter and advised Lt Col B that his wife and child had been in a car accident during the night and that he needed to go home. Lt Col B again told him he could

---

[1] Lt Col B testified that appellant had been upset with him several months earlier and threatened to go to the Inspector General because Lt Col B had delayed his entry into Squadron Officer School. Appellant was first on the list in terms of seniority, but Lt Col B asked the command to place appellant last for staffing reasons. Appellant entered the next available class.

not leave.  At this point, appellant became upset and began to yell at Lt Col B.  Lt Col B started to escort appellant to his office and ordered him to stop talking.  Appellant complied. While waiting for the elevator, appellant said, three times, "I'm not your nigger boy."  Lt Col B, appellant, and a witness to this remark then went directly to the Commander's office without further incident.  When asked by the Commander if Lt Col B had ever overtly discriminated against him or uttered racial slurs, appellant replied that Lt Col B had not.

Appellant subsequently was charged with and convicted of disrespect toward Lt Col B under Article 89 and with conduct unbecoming an officer under Article 133 for his interaction with the other nurses.  The issues raised by appellant in the present appeal pertain to the Article 133 charges and do not challenge his conviction for disrespect to Lt Col B.

APPELLANT'S INTERACTION WITH HIS COLLEAGUES

1.  Appellant's Interaction With 1Lt VC

1Lt VC met appellant in February 1995, during a 3-day CPR-Instructor course she attended shortly after she arrived at the hospital.  According to 1Lt VC, appellant sat next to her on 2 of the 3 days.  He made complimentary remarks about her appearance, and asked her a number of questions, including where she was from, whether she had a boyfriend, whether she worked

7

out, how much she weighed, and what type of men she liked.[2]  She stated that during these conversations, he touched her hair and the top of her kneecap.[3]  Other than moving away from his touch, she did not manifest concern about his remarks or conduct.

At the time of the CPR course, 1Lt VC and appellant worked in different sections of the hospital.  A year later, in March 1996, she was transferred to appellant's section of the hospital, the operating room.  According to 1Lt VC, appellant made several comments that she viewed as inappropriate, including a statement that her supervisor, Lt Col B, was a racist.[4]  She did not respond to him or speak to anyone else about these comments.

Subsequently, 1Lt VC was approached by another operating room nurse, Capt TT, who asked her if anyone had made her uncomfortable.  She told Capt TT about appellant's behavior at the CPR course the year before and the two then met with Lt Col B.

---

[2] Appellant was convicted of violating Article 133 by "persistently direct[ing] comments and questions of a personal or sexual nature" to 1Lt VC, including: "You have pretty hair," "You have pretty eyes," "How much do you weigh?," "What size are you?," "What is your phone number?," "Do you have a boyfriend?," "Does your boyfriend live in Montgomery?," and "What type of men do you like?"

[3] This physical contact resulted in appellant's conviction under Article 133.

[4] Appellant was acquitted of the specification of disrespect to a superior officer that encompassed these comments.  Appellant was also acquitted of the specification of conduct unbecoming an officer and a gentleman that entailed "inappropriate" comments he made to 1Lt VC after she began working in the operating room.

Although 1Lt VC later testified that appellant's behavior made her feel "uncomfortable" and that she found it "inappropriate," she did not communicate these feelings to him, nor did she tell anyone else about appellant's conduct. According to her testimony, she did not feel that appellant was attempting to become sexually intimate with her. She added that appellant's manner of communicating involved standing very close to people when he talked, and that it was his habit to touch people when he talked to them. She viewed this as an invasion of her private space, which made her uncomfortable. She stated that she had not told anyone about her interaction with appellant at the CPR course because "I was afraid to. I was new here. He was a captain; I was just a second lieutenant. I didn't see him any more. I had no more contact with him."

Although 1Lt VC testified that she viewed appellant's style of communication, which included touching, to be inappropriate, she emphasized that she did not view his actions towards her as sexual harassment, as morally unfitting, or as criminal conduct. She added that in her view, the matter had been blown out of proportion.

### 2. Appellant's Interaction with Capt LK

Capt LK arrived at Maxwell AFB in January 1996. Shortly thereafter, appellant offered to show her around town. A month

9

later, Capt LK ran into appellant and his family at a Black History Festival.  The next day, appellant called Capt LK, and she agreed to join him on a sightseeing tour.  On the tour, which included lunch, appellant asked her what kind of men she liked.  On the trip home, appellant put his hand on Capt LK's leg above the right knee.  She did not respond, but she asked him to take her home so she could pick up her daughter at school.  On a subsequent occasion, when they were together outside the operating room, appellant touched her face with the back of his hand.  Capt LK also testified that appellant made various comments to her at work, such as telling her he "was coming over" to her house, she looked fit, and asking her several times what kind of men she liked.[5]

Capt LK testified that despite feeling uncomfortable when appellant put his hand on her knee, she never made him aware of this.  She testified that his offer to go sightseeing did not offend her because it reflected customary interaction with new arrivals, nor did she find his comments on fitness to be inappropriate.  Although she found other remarks by appellant to be inappropriate and unprofessional, she did not tell appellant

---

[5] Appellant was convicted of violating Article 133 by "persistently direct[ing] comments and questions of a personal or sexual nature" to Capt LK, including: "I'm coming over tonight," "What kind of man are you attracted to?," "Are you dating anyone?," "You look fit," "Would you like to go sight-seeing?," and "You don't need to work out because you look fine."  He was also convicted of violating Article 133 as a result of touching Capt LK's knee, and was acquitted of violating Article 133 with respect to touching Capt LK's face.

that she had any concerns about his comments, nor did she communicate any concerns to other officers or the chain of command. She testified that she believed she could handle any concerns that she had about appellant by herself. Typically, she reacted to his remarks by responding in kind. For example, when he said "I'm coming over," she replied that she would tell his wife where "to pick up her stray dog."

In late March, Capt TT called Capt LK to ask whether anyone had ever made her feel uncomfortable at work. When she named appellant, Capt TT informed Capt LK that security police would be in touch with her.

### 3. Appellant's Interaction with Capt TT

When Capt TT arrived at Maxwell AFB in April 1995, she was the only female nurse assigned to the operating room. She worked directly with appellant from June 1995 until March 1996. Capt TT testified that she felt uneasy from the moment she met him because of the way he looked at her body, although she did not mention it to appellant or anyone else during this period. She and appellant had numerous discussions of a personal nature during the period in which they worked together. In June 1995, they discussed their families while sitting next to each other in an operating room. According to Capt TT, appellant asked if she was happily married, winked in a "sort of joking" fashion,

and put his hand on top of her thigh, toward the inside. She did not say anything, but she brushed his hand off, stood up, and walked away. She testified that she was "a little bit flabbergasted" by the touch, but not angry.[6]

Capt TT testified that on a separate occasion in June 1995, she walked into the operating room lounge while appellant and several others were talking and eating lunch. According to Capt TT,

> they were talking about Hollywood and about
> California and about people having affairs -
> - extramarital affairs. And I sat down with
> my food, and Captain Brown looked over at me
> and said, "Have you ever had an affair?"
> And I said, "No, I'm not that kind of girl,
> and why are you such a nibby guy?"[7]

She testified that the question embarrassed her and that she finished her lunch quickly and left the room while the others continued the conversation.

According to Capt TT, she and appellant subsequently were engaged in a conversation, in either June or July 1995, that covered a number of topics, including families and exercise. During that conversation, appellant, who had previously shown Capt TT a picture of his daughter, asked to see a picture of Capt TT's daughter. After viewing the picture, appellant asked

---

[6] Appellant was convicted of violating Article 133 as a result of this conduct.

[7] Capt TT testified that "nibby" was an "Indiana term" for nosey.

her a number of questions, including her clothing size, whether she wore the same size clothing as her daughter, and whether she worked out. He then commented on her appearance and said that he could tell she worked out. Capt TT later testified that she considered his question about her size to be inappropriate, but she did not express any concern to him at the time.

During this same period, appellant had a number of conversations with Capt TT during which he put his hand on her shoulder.[8] In August 1995, Capt TT decided to inform appellant of her discomfort with the touching. She did so in the course of a casual conversation by raising the topic of sexual harassment and telling appellant that at her previous base, a doctor had been "kicked out" of the Air Force for molesting a patient and sexual harassment. She then told appellant, "By the way, I don't like the way you touch me sometimes." Capt TT testified that when appellant replied that he did not know this bothered her, she confirmed that it did and that it made her uncomfortable.[9] Although Capt TT testified that she expressed her concern to appellant about the touchings, she did not advise

---

[8] Appellant was acquitted of the charge resulting from this contact.

[9] According to Capt TT, this conversation took place in the presence of another male nurse. The other nurse, however, testified that he did not recall this conversation.

appellant of any concern she might have had about the remarks he had made.

Shortly after this conversation, appellant touched Capt TT's right buttock while they were standing side-by-side interviewing a patient. Capt TT initially characterized the touch as a "soft squeeze," but agreed on cross-examination that it was "a touch." Afterward, appellant softly said he was sorry. As appellant walked away, she twice said in a lowered voice, "Don't do that again." She could not be certain whether appellant heard her.[10]

Capt TT testified that another touching incident occurred in October 1995. While interviewing a patient together, appellant reached in front of Capt TT for part of the medical record and, in the course of doing so, his hand and forearm brushed her breast. Capt TT backed up and "[g]ave him a really hateful look" and appellant apologized. She testified that she thought the contact may have been accidental and acknowledged on cross-examination that people often worked "elbow to elbow" in the operating room and that accidental contact could occur.[11]

---

[10] Appellant was convicted of violating Article 133 as a result of this contact.

[11] The members acquitted appellant of the specification concerning this incident.

Capt TT testified about several other conversations with appellant.  On one occasion, Capt TT entered the operating room lounge while appellant and others were engaged in a discussion about the sexual practices of the popular entertainer, Madonna:

> We were all in the OR [operating room] lounge, and there was a bunch of people--a group of people in there again during break. And there was a magazine there--a picture front magazine cover was of Madonna, ... and they were talking about--I guess she has a video and a book, and Madonna--I don't know; I've not seen it--but that Madonna masturbates, and they were talking about it. And Captain Brown looked at me and said, "Do women masturbate?" And I looked at a person sitting next to me, and I said, "Not the girls I know," or something to [sic] that sort.

Capt TT testified that conversations of a sexual nature were not unusual at work at that time.

In the fall of 1995, Capt TT was in the operating room lounge, showing another person a picture of her daughter, when appellant asked what size pants she wore.  According to Capt TT, she made a "sarcastic" response and asked rhetorically, "Are you writing another book?"  Appellant then replied "I'm sure other people have told you how nice looking you are."  Capt TT testified that in response, she "walked him off.  Just walked away."

In January 1996, Capt TT was having a conversation with Lt Col B about an upcoming vacation in Florida when appellant asked

whether she liked to go in the ocean and whether she wore a one or two-piece swimsuit.  She asked him why he wanted to know, and he replied that he guessed she wore a two-piece suit.  When asked about Lt Col B's reaction to these comments, Capt TT said that Lt Col B "didn't respond to it at all.  Honestly, a lot of people ignored what Captain Brown said to other people because a lot of times it was out of line."  Lt Col B testified that he had no recollection of appellant's comments, although he acknowledged that the remarks might have been made.

In March 1996, according to Capt TT, appellant approached her in the medication room and told her about an unpleasant encounter he had just had with a patient, in which he was concerned that a female patient was "coming on" to him.  He told Capt TT that the patient commented on how good he looked in his scrubs and asked if he was going to be the one who took her panties off.  The patient made him uncomfortable, and he asked another nurse to take over.[12]  He then asked Capt TT if she had ever experienced something similar.  She testified that she was "bothered" by this conversation because "he kept talking about it . . . . [H]e called his pants 'drawers' and stuff like that, and I just didn't want to hear it, and so I walked away."[13]

---

[12] Lt Col B testified that appellant had also informed him of the encounter with a patient.

[13] As a result of this conversation and the various conversations between appellant and Capt TT over the 10-month period, he was convicted of violating

Prior to the March 1996 dispute between Capt TT and appellant over the procedure for counting medical instruments, Capt TT did not voice any objections or otherwise express concern about appellant's remarks. With respect to physical contact, she conveyed her dislike of the touching in August 1995. Following the dispute about the medical instruments, she complained to Lt Col B. He referred the matter to higher authorities, which led to an investigation and the Article 133 charges against appellant. At trial, Capt TT testified that her interaction with appellant routinely made her feel uncomfortable, angry, or inferior. With respect to his comments, she testified: "The things that he said, I just -- I didn't want to make a scene. I didn't say anything. I usually just walked him off." She also testified: "I didn't acknowledge to him it was okay. I think he knew I didn't like it. [W]hen I would shrug my shoulder away and get up and walk away from him during a conversation, I think that was -- I made my point."

When asked why she had not reported the matter earlier, she said that although she was aware of Air Force policies on sexual harassment, including the pamphlet introduced into evidence at

---

Article 133 by "persistently direct[ing] comments and questions of a personal or sexual nature" to Capt TT, including: "Have you ever had an affair?," "You look like a size 4," "You have a very good shape and look very good for your age," "Do you wear a one piece or two piece swim suit?," "I bet you wear a two piece [swim suit]," "A patient told me I look good in my pants." "Are you happily married?." "Do you get along with your husband?," "Would you like to go out for lunch?," and "Do women masturbate?"

trial, she felt that she got along well with appellant and wanted to handle the matter herself.  Capt TT, who is Caucasian, also testified that she was afraid of starting a racial issue and having appellant call her a racist, apparently because he frequently called their supervisor a racist.[14]  She summed up her position by testifying:

> I didn't want to start a fuss.  I was new there.  I worked with all men.  I didn't want to be the new female coming in starting a fuss.  I didn't want my husband to know because I thought my husband might want to go confront him and do something that maybe he shouldn't.  I didn't want [Lt Col B] to know because Captain Brown and [Lt Col B] were having a problem anyway that Captain Brown told me was racist [sic].  I didn't want to start a racial issue.  I thought I was the only person involved in all this.  I didn't want to say that he was touching me or accuse him of anything, thinking that I was the only person involved.  I honestly thought he would say, "That's just her word against mine."  I thought I could take care of it myself by just letting him know and pushing him away and letting him know nonchalantly – I wanted to get along with him.  We did get along well.  We – we got along very well when we worked together as long as I kept my cool and . . .[Pause.] There was times [sic] where we had some disputes, but it wasn't over the touching. You know, over personal stuff.  It was over something to do with business.  [Pause.]  I didn't want to tell anyone honestly.

---

[14] Capt TT testified that she and appellant discussed racism frequently. Appellant was acquitted of the specification of disrespect to a superior that

  II.  BACKGROUND: CONDUCT UNBECOMING AN OFFICER AND A GENTLEMAN

Article 133 prohibits "conduct unbecoming an officer and a gentleman."  In civilian life, this broadly-worded statute would be subject to challenge as unconstitutionally vague in a criminal law proceeding.  See Parker v. Levy, 417 U.S. 733, 753-56 (1974).  The Supreme Court has held, however, that Article 133 is constitutional as applied to members of the armed forces, so long as the accused has received "fair warning of the criminality" of his or her conduct.  Id. at 756.  In this regard, the language in the Manual for Courts-Martial has "narrowed the very broad reach of the literal language of [Articles 133 and 134 (the General Article)] . . . , and at the same time has supplied considerable specificity by way of examples of the conduct which they cover."  Id. at 753-54.  The Supreme Court also noted that "further content may be supplied . . . by less formalized custom and usage."  Id. at 754.

The Manual for Courts-Martial notes with respect to the offense of conduct unbecoming an officer and a gentleman:

> There are certain moral attributes common to
> the ideal officer and the perfect gentleman
> . . . . Not everyone is or can be expected
> to meet unrealistically high moral
> standards, but there is a limit of tolerance
> based on customs of the service and military
> necessity below which the personal standards
> of an officer, cadet, or midshipman cannot

---

encompassed comments he made to Capt TT about Lt Col B being a racist.

19

> fall without seriously compromising the
> person's standing as an officer, cadet, or
> midshipman or the person's character as a
> gentleman.  This article prohibits conduct
> by a commissioned officer, cadet, or
> midshipman which, taking all the
> circumstances into consideration, is thus
> compromising.

Para. 59c(2), Part IV, Manual for Courts-Martial, United States (2000 ed.).[15]  The Manual reflects traditional military law. Winthrop, in his authoritative treatise, noted with respect to an earlier version of the statute:

> Though it need not amount to a crime, it
> must offend so seriously against law,
> justice, morality or decorum as to expose to
> disgrace, socially or as a man, the
> offender, and at the same time must be of
> such a nature or committed under such
> circumstances as to bring dishonor or
> disrepute upon the military profession which
> he represents.
>
> . . . [I]f the act, though ungentlemanlike,
> be of a trifling character, involving no
> material prejudice to individual rights, or
> offence against public morals or decorum, it
> will not in general properly be viewed as so
> affecting the reputation of the officer or
> the credit of the service as to be made the
> occasion of a prosecution under the Article.

William Winthrop, Military Law and Precedents 711-12 (2d ed. 1920 Reprint) (footnotes omitted).  Article 133 is not violated by conduct that falls short of the attributes of an "ideal officer and the perfect gentleman" or by "slight deviations

---

[15] All Manual provisions are identical to the ones in effect at the time of appellant's court-martial.

constituting indecorum or breaches of etiquette," but by conduct
that exceeds the "limit of tolerance" set "by the custom of the
service to which the officer belongs."  James Snedeker, Military
Justice Under the Uniform Code 890 (1953); see generally Keithe
E. Nelson, Conduct Expected of An Officer and a Gentleman:
Ambiguity, 12 A.F. L. Rev. 124 (1970).


## III.  DISCUSSION

### A.  CONSIDERATION OF AIR FORCE POLICY ON
### DISCRIMINATION AND SEXUAL HARASSMENT

Appellant argues that the military judge erred when he
permitted the Government to introduce into evidence Air Force
Pamphlet (AFP) 36-2705, Discrimination and Sexual Harassment (28
February 1995).  We review this ruling for an abuse of
discretion.  United States v. McElhaney, 54 MJ 120, 129 (2000).

At the time of the events that are the subject of the
present case, the Air Force did not have a punitive regulation
proscribing sexual harassment.  Conduct amounting to sexual
harassment could be punished as a military offense if it
constituted maltreatment of a subordinate under Article 93,
UCMJ, 10 USC § 893; see para. 17c(2), Part IV, Manual, supra.
The Government, however, chose not to prosecute the present case
under Article 93, and has not argued at trial or on appeal that

appellant violated regulatory or customary norms regarding superior-subordinate relationships.

Because the Government chose to prosecute the case under Article 133 as conduct unbecoming an officer and a gentleman, it sought to introduce into evidence the Air Force pamphlet setting forth policy on sexual harassment to show notice of the type of conduct that was prohibited and to establish a benchmark for conduct deemed unbecoming an officer and a gentleman in the Air Force community. As noted in the Government's final brief in the present appeal, "[t]he pamphlet was relevant in establishing the standard of conduct expected of Air Force officers," and introduction of the pamphlet was "necessary to establish that Appellant was aware that his behavior was impermissible." Answer to Final Brief at 5, 24.

The pamphlet describes various examples of conduct that may raise concerns, but does not purport to identify any particular action as prohibited. Instead, it relies upon the following definition of sexual harassment to establish notice of the standard of conduct:

> **Sexual harassment.** A form of sex discrimination that involves unwelcomed sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:
>
> • Submission to or rejection of such conduct is made either explicitly or implicitly a

> > term or condition of a person's job, pay
> > or career, or
> > - Submission to or rejection of such conduct
> >   by a person is used as a basis for career
> >   or employment decisions affecting that
> >   person, or
> > - Such conduct has the purpose or effect of
> >   unreasonably interfering with an
> >   individual's work performance or creates
> >   an intimidating, hostile, or offensive
> >   work environment.

AFP 36-2705 at 29. The pamphlet adds that the abuse "need not result in concrete psychological harm to the victim, but rather need only be so severe or pervasive that a reasonable person would perceive, and the victim does perceive, the work environment as hostile or abusive." In addition, the pamphlet notes that with respect to military personnel, the term "'[w]orkplace' is an expansive term. . . and may include conduct on- or off-duty, 24 hours a day." Id.

The pamphlet provides detailed guidance for dealing with improper conduct. The guidance emphasizes the preference for informal resolution at the lowest possible level, but does not preclude formal actions, including military justice proceedings. Id. at 6-15.[16] The pamphlet does not prohibit personal or sexual

---

[16] Other Air Force regulations note that the military Equal Opportunity and Treatment Program has primary responsibility for sexual harassment complaints and that attempts at informal resolution are encouraged before initiating the formal complaint process. See para. 4.9, AFI 36-2706, Military Equal Opportunity and Treatment Program (1 December 1996)(the purpose of the complaint process is to "[e]ncourage early reporting of problems at the lowest level and promote fair resolution"); para. 3.37, AFI 90-301, Inspector General Complaints (12 August 1999)(Military Equal Opportunity has primary responsibility for sexual harassment complaints and all such complaints filed through IG channels will be immediately referred to MEO); para. 1.10, AFI 71-

relationships among officers, nor does it establish a general prohibition against comments of a personal or sexual nature among officers. Only "unwelcomed" comments which affect employment or create a hostile work environment are prohibited.

At trial, defense counsel argued that the pamphlet was not relevant under Mil.R.Evid. 401 and 402, Manual, supra, and that its probative value was outweighed by the danger of unfair prejudice under Mil.R.Evid. 403. Counsel asserted that the pamphlet could not be used in a criminal prosecution because it was not a punitive regulation and did not accurately define what legally constitutes sexual harassment. Counsel expressed additional concern, which is reflected in Granted Issue II, that the examples in the pamphlet might be viewed as conclusively establishing sexual harassment, and that any material used in that fashion would improperly influence the members to appellant's detriment.

After considering detailed argument from both parties, the military judge admitted the pamphlet, finding it relevant to establish whether appellant's conduct constituted a violation of Article 133. He addressed defense concerns about prejudice through an instruction to the members, in which he advised them that appellant was not charged with a dereliction of duty by

_____

101, Criminal Investigations (1 December 1999)(unless it involves a specific criminal offense, like rape, or a person in the grade of Colonel or above, AFOSI does not investigate complaints of sexual harassment).

24

failing to follow the pamphlet, and that if they should decide that appellant's behavior contradicted the pamphlet's guidance, "it does not automatically follow that his conduct was unbecoming an officer."

We agree with the military judge that the pamphlet was relevant to establish notice of prohibited conduct and the applicable standard of conduct in the Air Force community. See United States v. Boyett, 42 MJ 150 (CMA 1995). Such notice was particularly important in the present case. As a general matter, personal interactions among military officers are not prohibited by law, regulation, policy, or custom. On the contrary, the unique conditions of military service -- frequently involving long working hours, lengthy deployments for training and operations, harsh working and living conditions, and dangerous assignments -- tend to break down the distinctions between personal and professional associations prevalent in civilian society. As noted in the pamphlet, for military personnel, the term "workplace" is an expansive term that may include "off-duty" conduct, 24 hours a day. AFP 36-2705 at 29.

As a general matter, military officers are not precluded from engaging in conversations with a fellow officer of the opposite sex involving the type of comments made in the present case with respect to physical appearance, social contacts, or sexual matters absent a pertinent custom or policy placed in

evidence.  This is not particularly remarkable, given the variety of comments that are likely to be made in conversations between officers of the opposite sex who may have relationships ranging from casual acquaintance through dating, courtship, and marriage.

Under these circumstances, the existence of pamphlets or other evidence of customs and standards limiting such communications are of particular importance in providing notice of the distinction between permissible banter and impermissible remarks. Cf. United States v. Rogers, 54 MJ 244, 256 (2000) (citing an Air Force Instruction as establishing a standard for dating relationships among officers by limiting the prohibition to relationships between senior and junior officers within the same command).

The focus on "unwelcomed" comments in the pamphlet was relevant in the present case because it provided notice of the standard for making the critical distinction between permissible and impermissible speech.  Given the wide variety of personalities and relationships that may exist among officers, there is likely to be an equally wide variety of reactions to comments of a personal or sexual nature.  The standard in the pamphlet emphasizes the need to focus on the personal interactions at issue to determine whether the remarks were "unwelcomed."  In some cases, the comments may be so egregious

that any reasonable officer would know that they would be unwelcome. In most cases, however, it is necessary to examine the nature of the interaction between the parties to the conversation to determine whether the person making the remarks had reasonable notice that the comments would be regarded as unwelcome, particularly when the comments are not overtly sexual or demeaning, for the standard also requires that the content of conduct be sexual.

Likewise, given the wide variety of personalities present in the service, co-workers may be offended from time to time by the behavior of their colleagues. But offensive conduct does not necessarily constitute criminal conduct. The pamphlet appropriately sets a higher standard, requiring that conduct be so severe or pervasive that it creates a hostile work environment. By structuring such an analysis, the pamphlet establishes a standard for distinguishing between permissible and impermissible speech. Therefore, the pamphlet was admissible because it fulfilled the requirement under Article 133 to establish a standard of conduct and notice of the standard.

We recognize that there is a countervailing consideration -- the danger that introduction into evidence of examples of proscribed conduct could be used to impermissibly introduce command policy into the deliberation room, leading the members

to reach a conclusion based upon the published examples rather than their application of the relevant standard to the facts of the case. See, e.g., United States v. Grady, 15 MJ 275 (CMA 1983). When it is necessary to introduce the custom of the service to prove an element of an offense, however, it is likely that the probative value will outweigh the prejudicial effect. Mil. R. Evid. 403. In some cases, it may be necessary to redact examples or to provide tailored instructions explaining the difference between examples and standards of conduct, and further explaining the manner in which the standards of conduct apply to the elements of proof. The defense did not request either step in the present case, and we do not find that the possibility of confusion was so great that the military judge was required to redact material or give tailored instructions on his own motion. Accordingly, we hold that the military judge did not abuse his discretion by admitting the pamphlet.

## B. LEGAL SUFFICIENCY OF THE EVIDENCE

In considering whether the evidence in this case is legally sufficient to sustain appellant's conviction for conduct unbecoming an officer and a gentleman, we must "view[] the evidence in the light most favorable to the prosecution" and determine whether "any rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt."
Jackson v. Virginia, 443 U.S. 307, 319 (1979).

In the present case, it was necessary for the Government to prove beyond a reasonable doubt that appellant committed the charged acts and that under the circumstances, the acts constituted conduct unbecoming an officer and a gentleman.  As noted in section III. A., supra, the Government relied upon AFP 36-2705 to establish the applicable standard of conduct.  Under the circumstances of the present case, the Government endeavored to show that appellant's conduct fell within the pamphlet's proscriptions; that is: (1) appellant's conduct was "unwelcomed"; (2) it consisted of verbal and physical conduct of a sexual nature; and (3) it created an intimidating, hostile, or offensive work environment that was so severe or pervasive that a reasonable person would perceive the work environment as hostile or abusive, and the victim of the abuse perceived it as such.[17]  We shall first consider the verbal remarks and then consider the physical activity.

1.  The Allegations Involving Appellant's Remarks

The Government charged appellant with "persistently direct[ing] comments and questions of a personal or sexual

---

[17] The prosecution did not contend that appellant's conduct violated those portions of the policy involving unwelcomed sexual advances that are made a condition of employment or that affect career or employment decisions.

nature" to three of his fellow nurses.  He was not charged with maltreatment under Article 93, or abuse of a superior-subordinate relationship under Article 133.  In that regard, we note that the Government preferred a charge of maltreatment under Article 93 against appellant but did not refer it to court-martial.  According to the prosecution, this decision was made because "none of the three victims named in the . . . specifications were . . . subject to the orders of the accused in this case."

The prosecution emphasized that the heart of each specification was the allegation that appellant, a married man, acted "persistently" in communicating personal or sexual matters to the other nurses.  The term "persistent" in this context refers to "continuing in a course of action without regard to opposition or previous failure," Webster's Third New International Dictionary 1686 (1981), which echoes the policy set forth in the pamphlet.  As noted in Part III. A., supra, the pamphlet does not establish a general prohibition against remarks of a personal or sexual nature.  Only "unwelcomed" remarks so severe or pervasive that they create a hostile or abusive environment are proscribed.  The limitation of the proscription to "unwelcomed" comments is a critical component of the policy, because it separates speech that will be tolerated from speech that is prohibited.

30

Under the policy in the pamphlet, impermissible speech could be shown by demonstrating that: (1) appellant's remarks were "unwelcomed" and (2) the comments were "so severe or pervasive" that a reasonable person would perceive that the remarks created a "hostile or abusive" environment, and the victim perceived them as such.

The record is clear that none of the nurses with whom appellant conversed advised him that his remarks were not welcome. On the contrary, the record reflects that his remarks usually produced a straightforward response or a response in kind, but he was never told that the remarks were unwelcomed. It is noteworthy that Capt TT, who firmly voiced her objections to his physical contact with her, did not mention any concerns to him about the tenor of his remarks, either at that time or thereafter. Likewise, none of his other colleagues or supervisors advised him that he was engaging in inappropriate behavior -- even though many of the conversations were observed by others.

The record reflects a working atmosphere in and around the operating room and lounge which accepted discussions involving physical appearance and sexual matters. For example, appellant's question to Capt TT about extramarital affairs did not occur in isolation, but in the context of an ongoing discussion among the personnel in the lounge about extramarital

affairs in Hollywood.  Similarly, his question to Capt TT about

masturbation occurred during a discussion among personnel of

sexually explicit materials produced by a popular entertainer,

including the topic of masturbation.  Capt TT testified that

conversations involving sexual topics were commonplace at that

time in the operating room, and she acknowledged that she had

been known to make an off-color joke.

An even more telling example involves appellant's reference

to Capt TT in a two-piece swimsuit.  Again, these remarks were

not made in isolation, but occurred in the presence of the

supervisor, Lt Col B.  Appellant made the swimsuit comment in

the course of interrupting Capt TT's conversation with Lt Col B.

According to Capt TT, Lt Col B not only failed to express any

concern about the interruption, he said nothing to indicate that

he regarded appellant's remarks as inappropriate, indicating the

degree to which comments about physical appearance were

tolerated.[18]

Although the standard in the pamphlet does not require a

recipient of sexual remarks to tell the speaker that the remarks

were unwelcome, the recipient's action or inaction in response

---

[18] While this arguably could show a failure of leadership on the part of Lt Col B, we note that Lt Col B testified that he did not recall the swimsuit remark incident, but stated that if he did not think a comment was improper he would not approach the individual about it.  We reach no conclusion as to whether the incident occurred and, if so, how he responded.  We accept Capt TT's testimony solely for the purposes of considering the legal sufficiency of the evidence under Jackson, supra.

to the remarks is relevant to determining whether the speech was unwelcome and whether it was "so severe or pervasive that a reasonable person would perceive, and the victim does perceive, the work environment as hostile or abusive."  The record of the responses of the recipients in the present case does not support a finding that appellant's remarks violated this standard.

We note that disparity in rank or supervisory relationships may be relevant to a determination as to whether the standards in the pamphlet have been violated.  The mere existence of such factors, however, does not establish that speech was unwelcome or that it created a "hostile or abusive" work environment. Although appellant served in a supervisory position with regard to 1Lt VC and was superior in rank to Capt TT for most of the period encompassing the charged offenses, he was not charged with an abuse of rank offense.  In fact, the prosecution dropped the only charge dealing with an abuse of rank.  Moreover, the prosecution's case did not rely on disparity in rank to prove that appellant's comments violated Air Force standards.

Finally, we note that the record does not support a finding that appellant's comments created "an intimidating, hostile, or offensive work environment." The pamphlet defines what type of conduct creates a hostile work environment:

> The above definition emphasizes that
> workplace conduct, to be actionable as
> "abusive environment harassment,["] need not

> result in concrete psychological harm to the
> victim, but rather need only be so severe or
> pervasive that a reasonable person would
> perceive, and the victim does perceive, the
> work environment as hostile or abusive.

AFP 36-2705 at 29.

The subjective component of the standard requires evidence that the recipient perceived his or her work environment as hostile or abusive as a result of severe or pervasive conduct. The testimony of the three nurses falls short of the standard. 1Lt VC testified that appellant's behavior was inappropriate, but did not amount to sexual harassment. Capt LK testified that some of appellant's comments were inappropriate and made her uncomfortable, others did not offend her, and that she felt she could handle the situation herself. Capt TT testified that she had a good working relationship with appellant. In light of the fact that the recipients of the charged comments testified that the verbal conduct was merely inappropriate or unprofessional and that the situation was manageable, the evidence is legally insufficient to demonstrate that the victims perceived the work environment as hostile or abusive according to the standard relied upon by the Government in the Air Force pamphlet.

The rigorous standard in the pamphlet shows that it is not merely a civility code for policing the workplace. Only severe conduct with harsh effects constitutes sexual harassment under the pamphlet; comments or questions that offend one's

34

sensibilities and make one uncomfortable do not create a hostile work environment under the standard in the pamphlet. Appellant's breaches of etiquette may well have warranted "instruction, counseling or other types of administrative corrective action," United States v. Wolfson, 36 CMR 722, 731 (ABR 1966), but his comments did not violate the standard relied upon by the Government at trial to establish the custom of the Air Force for purposes of Article 133. Accordingly, the findings of guilty with respect to specification 7 of Charge II and specification 1 of the Additional Charge will be set aside, and those specifications will be dismissed. Specification 1 of Charge II will be modified as described in Section IV, infra.


2. The Allegations Involving Physical Contact

We reach a different conclusion with respect to the incidents involving physical contact. There is greater latitude of permissible action with respect to speech than physical contact because of the manner in which the interplay of words may be used to establish the parameters of a relationship. In the circumstances of the relationship between appellant and his fellow nurses, it was not reasonable for him to assume that they would consent to physical contact of an intimate nature absent some communication of receptivity or consent.

In the present case, it is noteworthy that although the members convicted appellant of four instances of physical contact, they acquitted him of three other instances. We take into consideration the fact that the members, who heard the testimony and observed the demeanor of the witnesses, viewed the evidence as distinguishing between permissible and impermissible contact. The convictions involved intimate contact with members of the opposite sex that was not incidental, collegial, or innocuous and did not take place where there was any verbal or nonverbal indication of consent. Accordingly, we will affirm appellant's convictions under Article 133 as set forth in specifications 3 and 6 of Charge II, specification 3 of the Additional Charge, and the portion of specification 1 of Charge II concerning physical contact. Because we have dismissed or modified the only charges affected by Granted Issue I, it is not necessary to address Issue I in this opinion.


IV. CONCLUSION


The decision of the United States Air Force Court of Criminal Appeals is affirmed in part and reversed in part, as follows: the findings of guilty are affirmed with respect to specification 3 of Charge I, specifications 3 and 6 of Charge II, specification 3 of the Additional Charge, and specification

36

1 of Charge II, as modified.[19]  The findings of guilty with respect to specification 7 of Charge II and specification 1 of the Additional Charge are set aside, and those specifications are dismissed.  The sentence is set aside.  The record of trial is returned to the Judge Advocate General of the Air Force.  A rehearing as to sentence may be ordered.

---

[19] Specification 1 of Charge II is modified to read as follows: "Did, at or near Maxwell Air Force Base, Alabama, on divers occasions from on or about 1 February 1995 to on or about 3 February 1995, wrongfully and dishonorably touch the hair and knee of [1Lt VC], a woman not his wife, without the consent of the said [1Lt VC], that, under the circumstances, these acts constituted conduct unbecoming an officer and a gentleman."

SULLIVAN, Judge (concurring):

I concur with the excellent opinion of my brother, Judge Effron.  As I have said before, "When the Government makes speech a crime, the judges on appeal must use an exacting ruler." [*]  In this case, I particularly find disturbing the Additional Charge (specification one), where over a 10-month period, appellant is charged with directing 11 questions and comments to Capt TT -- statements like: "You look like a size 4,"  "Would you like to go out for lunch?," and  "Are you happily married?"  These statements were never reported to authorities when they happened, but were allegedly noted as they happened by Capt TT in a journal written in her "own little code."  (R. 169).  The journal was used by Capt TT to make her harassment complaint in a memorandum for record to Lt Col B immediately after appellant had an unpleasant dispute with Capt TT over the procedure for counting medical instruments in the operating room. (R. 193, 200-01, 392). The journal disappeared before trial.  (R. 170).

Did appellant commit a crime with each of the questions or comments?  Were there 11 crimes consolidated by the Government into one charging specification?  Or did the cumulative effect of

[*] United States v. Brinson, 49 MJ 360, 361 (1998).

these 11 statements constitute one crime in the eyes of the jury? Like Judge Effron, I find that these comments need to be looked at carefully in the context of when they were spoken in order to find criminality. Viewing the comments of appellant, I find the comments may not be appropriate, but in this case, they are not criminal. A different result might have been obtained if a strict superior-subordinate relationship was the backdrop for these comments. But that is not this case, where the conversations were among professional nurses of more or less equal rank.

United States v. Brown, No. 00-0295/AF

CRAWFORD, Chief Judge (concurring in part and dissenting in part):

I agree with the majority that the military judge did not err with respect to Issue II. With regard to Issue I, like the court below, I find that appellant's requested instruction was confusing and erroneous. Accordingly, I would find no abuse of discretion by the military judge in refusing to give this instruction. As I find the evidence to be legally sufficient to support the findings of guilt of the various specifications of Charge II and the Additional Charge, like the Court of Criminal Appeals, I would affirm appellant's convictions and sentence.

At the conclusion of the evidence on findings, civilian defense counsel asked the military judge for a special instruction, as follows:

> The Government is not required to prove all of the means or methods alleged in a particular specification.

> At least two-thirds of the members, or ___ of the members, must agree with each other, however, that the same means or method alleged in a particular specification was, in fact, engaged in or employed by the Accused in allegedly committing the offense alleged in that particular specification. The two-thirds of the members need not unanimously agree on each means or method, but, in order to convict, must unanimously agree upon at least one such means or method as one engaged in by the Accused.

> Unless the Government has proven the same means or method to at least two-thirds of the members, beyond a reasonable doubt, you must acquit the Accused of the offense alleged in that particular specification.

The military judge rejected the defense's request and instructed as follows:

> If you have doubt about the time or specific manner alleged but you are satisfied beyond a reasonable doubt that the offense was committed at a time or in a particular manner which differs slightly from the exact time or manner in the Specification, you may make minor modifications in reaching your findings by changing the time or manner described in the Specification, provided you do not change the nature or identity of the offense. If you discuss doing that, you can come and ask me for more suggestions on how to go about doing that.

A military judge has substantial discretion in deciding which instructions to give. United States v. Damatta-Olivera, 37 MJ 474, 478 (CMA 1993). See RCM 920(c), Discussion, Manual for Courts-Martial, United States (1995 ed.).[1] The test to determine whether denial of a requested instruction is error is whether: (1) the proposed charge is correct; (2) "it is not substantially covered in the main charge"; and (3) "it is on such a vital point in the case that the failure to give it deprived defendant of a defense or seriously impaired its

---

[1] All Manual provisions are cited to the version in effect at the time of appellant's court-martial. The current version is unchanged.

United States v. Brown, No. 00-0295/AF

effective presentation." Id., quoting United States v. Winborn,

14 USCMA 277, 282, 34 CMR 57, 62 (1963).

In Schad v. Arizona, 501 U.S. 624, 631 (1991), Justice

Souter, writing for a four-Justice plurality, answered

appellant's objection:

> Our cases reflect a long-established rule of the
> criminal law that an indictment need not specify
> which overt act, among several named, was the
> means by which a crime was committed.  In
> Andersen v. United States, 170 U.S. 481 (1898),
> for example, we sustained a murder conviction
> against the    challenge that the indictment on
> which the verdict was returned was duplicitous in
> charging that death occurred through both
> shooting and drowning.  In holding that "the
> Government was not required to make the charge in
> the alternative," id. at 504, we explained that
> it was immaterial whether death was caused by one
> means or the other.  Cf.  Borum v. United States,
> 284 U.S. 596 (1932) (upholding the murder
> conviction of three codefendants under a count
> that failed to specify which of the three did the
> actual killing); St. Clair v. United States, 154
> U.S. 134, 145 (1894).  This fundamental
> proposition is embodied in Federal Rule of
> Criminal Procedure 7(c)(1), which provides that
> "[i]t may be alleged in a single count that the
> means by which the defendant committed the
> offense are unknown or that the defendant
> committed it by one or more specified means."

The Supreme Court recently reiterated this point in

Richardson v. United States, 526 U.S. 813, 817 (1999):

> ... a federal jury need not always decide unanimously
> which of several possible sets of underlying brute
> facts make up a particular element, say, which of
> several possible means the defendant used to commit an

3

United States v. Brown, No. 00-0295/AF

> element of the crime.  Schad v. Arizona, 501 U.S. 624,
> 631-632 (1991) (plurality opinion); Andersen v. United
> States, 170 U.S. 481, 499-501 (1898).  Where, for
> example, an element of robbery is force or the threat
> of force, some jurors might conclude that the
> defendant used a knife to create the threat; others
> might conclude he used a gun.  But that disagreement -
> - a disagreement about means -- would not matter as
> long as all 12 jurors unanimously concluded that the
> Government had proved the necessary related element,
> namely, that the defendant had threatened force.  See
> McKoy v. North Carolina, 494 U.S. 433, 449 (1990)
> (Blackmun, J., concurring).

The Courts of Appeals are in agreement.  United States v. Reeder, 170 F.3d 93, 105 (1st Cir. 1999); Bae v. Peters, 950 F. 2d 469, 480 (7th Cir. 1991); United States v. Kim, 196 F.3d 1079, 1083 (9th Cir. 1999); Williamson v. Ward, 110 F.3d 1508, 1523 (10th Cir. 1997); Sims v. Singletary, 155 F.3d 1297, 1313 (11th Cir. 1998); United States v. Vidal, 23 MJ 319, 324 (CMA 1987); United States v. Garner, 43 MJ 435, 437 (1996).

Accordingly, two-thirds of the members of the court-martial adjudicating appellant's guilt or innocence had to agree that appellant committed the underlying offense.  Two-thirds of the members did not have to agree on the method by which appellant committed his misconduct.  As the proposed instruction did not comport with the law and was also confusing, the military judge did not abuse his discretion in denying the defense counsel's request that he give it.

4

United States v. Brown, No. 00-0295/AF

Issue III questions the legal sufficiency of the evidence. In the case of legal sufficiency of the evidence, the standard of review is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." United States v. Turner, 25 MJ 324 (CMA 1987); see Jackson v. Virginia, 443 U.S. 307, 319 (1979). Further, "[i]n resolving legal-sufficiency questions, this Court is bound to draw every reasonable inference from the evidence of record in favor of the prosecution." United States v. Blocker, 32 MJ 281, 284 (CMA 1991); see United States v. McGinty, 38 MJ 131 (CMA 1993)(determination that one witness is more believable than another is sufficient).

In order to maintain a finding of conduct unbecoming an officer and gentleman, it must generally be shown (1) that "the accused did or omitted to do certain acts" and (2) that, "under the circumstances, these acts or omissions constituted conduct unbecoming an officer and gentleman." Para. 59b, Part IV, Manual, supra. As the Manual explains:

> Conduct violative of this article is action or behavior in an official capacity which, in dishonoring or disgracing the person as an officer, seriously compromises the officer's character as a gentleman, or action or behavior in an unofficial or private capacity which, in

5

> dishonoring or disgracing the officer personally, seriously compromises the person's standing as an officer. There are certain moral attributes common to the ideal officer and the perfect gentleman, a lack of which is indicated by acts of dishonesty, unfair dealing, indecency, indecorum, lawlessness, injustice, or cruelty. Not everyone is or can be expected to meet unrealistically high moral standards, but there is a limit of tolerance based on customs of the service and military necessity below which the personal standards of an officer, cadet, or midshipman cannot fall without seriously compromising the person's standing as an officer, cadet, or midshipman or the person's character as a gentleman. This article prohibits conduct by a commissioned officer, cadet, or midshipman which, taking all the circumstances into consideration, is thus compromising.

Para. 59c(2), Part IV, Manual, supra (emphasis added). Clearly, when viewed in its entirety, appellant's behavior exemplifies a standard against which a charge of conduct unbecoming an officer can be measured.

As this Court has said on prior occasions, we assess criminality under Article 133 by looking at whether the conduct charged is dishonorable and compromising, not whether it otherwise amounts to a crime. See United States v. Giordano, 15 USCMA 163, 168, 35 CMR 135, 140 (1964); United States v. Rogers, 54 MJ 244 (2000). I disagree with the majority's piecemeal assessment of appellant's remarks to his three female co-workers, instead of examining the totality of his relationship

6

with these three officers and his sustained pattern of
inappropriate comments.

The majority errs by concluding that unless appellant's
remarks were "unwelcomed," as required by Air Force policy, his
language was not a violation of Article 133.[2]  While none of the
three officer victims ever looked appellant in the eyes after he
made one of his sexually suggestive remarks and said, "Your
comment is unwelcome," that lack of a rebuke is not
determinative of the issue.  When one looks at the various
comments that appellant made to his three nursing co-workers,[3] I
find a predatory pattern of comments that are so pervasive as to

---

[2] Following his admission of Prosecution Exhibit 1, AFP 36-2705, which we all
agree was properly admitted, the military judge gave the following cautionary
instruction:  "If you find that the accused did engage in the alleged conduct
and that his conduct was contrary to the provisions of Prosecution Exhibit 1,
it does not automatically follow that his conduct was unbecoming an officer.
Prosecution Exhibit 1 is simply one piece of evidence for you to consider in
determining if the accused's conduct, should you determine that it occurred,
was unbecoming an officer."  Unfortunately, it appears that the majority
finds that Pros. Ex. 1 is the only piece of evidence that is determinative of
whether or not appellant's conduct was unbecoming an officer and a gentleman.

[3] "Specification 1, Charge II:  In that CAPTAIN MICHAEL C. BROWN, United
States Air Force, 42d Medical Operations Squadron, Maxwell Air Force Base,
Alabama, a married man, did, at or near Maxwell Air Force Base, Alabama, on
divers occasions from on or about 1 February 1995 to on or about 3 February
1995, wrongfully and dishonorably persistently direct comments and questions
of a personal or sexual nature to First Lieutenant [VC], to wit:  "You have
pretty hair," "You have pretty eyes," "How much do you weigh?," "What size
are you?," "What is your phone number?," Do you have a boyfriend?," "Does
your boyfriend live in Montgomery?," and "What type men do you like?," or
words to that effect.... that, under the circumstances, these comments [and]
questions ... constituted conduct unbecoming an officer and gentleman."

"Specification 7, Charge II - In that CAPTAIN MICHAEL C. BROWN, United States
Air Force, 42d Medical Operations Squadron, Maxwell Air Force Base, Alabama,
a married man, did, at or near Maxwell Air Force Base, Alabama, on divers

compromise appellant's standing with his colleagues as an Air

Force officer, as well as creating an abusive work environment.

As Capt TT, one of the victims, said in response to questioning:

"There was often times that he said things that were

inappropriate...."  Another victim, 1Lt VC, sums up the

situation best.  When asked about appellant's remarks to her,

she responded:  "I don't think it would be appropriate for

anyone to ask those type of questions, if you're in the Air

Force or not."  Taking the evidence in the light most favorable

to the prosecution, I have no trouble finding that the triers of

fact in this case could have found all the essential elements of

---

occasions from on or about 12 February 1996 to on or about 29 March 1996, wrongfully and dishonorably persistently direct comments and questions of a personal or sexual nature to Captain [LK], to wit: "I'm coming over tonight," "What kind of man are you attracted to?," "Are you dating anyone?," "You look fit," "Would you like to go sight-seeing?," and "You don't need to work out because you look fine," or words to that effect, that, under the circumstances, these comments and questions constituted conduct unbecoming an officer and gentleman."

"Specification 1, Additional Charge:  In that CAPTAIN MICHAEL C. BROWN, United States Air Force, 42d Medical Operations Squadron, Maxwell Air Force Base, Alabama, a married man, did, at or near Maxwell Air Force Base, Alabama, on divers occasions from on or about 1 June 1995 to on or about 29 March 1996, wrongfully and dishonorably persistently direct comments and questions of a personal or sexual nature to Captain [TT], a married woman not his wife, to wit:  "Have you ever had an affair?," "You look like a size 4," "You have a very good shape and look very good for your age," "Do you wear a one piece or two piece swim suit?," "I bet you wear a two piece [swimsuit]," "A patient told me I look good in my pants," "Are you happily married," "Do you get along with your husband," "Would you like to go out for lunch?," "Would you like to come over to my house?," and "Do women masturbate?," or words to that effect, that, under the circumstances, these comments and questions constituted conduct unbecoming an officer and gentleman."

the crime beyond a reasonable doubt.  Accordingly, I would affirm the findings and sentence.

<u>United States v. Brown</u>, 00-0295/AF

BAKER, Judge (concurring in part and dissenting in part):

I concur with the majority's handling of Issues I and II.  On Issue III, I agree with the majority that this is a close case whose resolution revolves around the application of <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), to specific facts.  However, I disagree with the majority opinion's conclusion and, therefore, dissent on Issue III.  For the reasons that follow, I would affirm the court below with respect to the charges of verbal harassment, as well as those involving physical contact.

The Government has charged appellant with conduct unbecoming an officer based on persistent verbal comments in violation of Air Force policy on sexual harassment.  As a result, the majority's analysis rightly hinges on whether or not appellant was on notice that his verbal conduct was unwelcome.  Air Force policy defines sexual harassment as

> [a] form of sex discrimination that involves
> unwelcomed sexual advances, requests for sexual
> favors, and other verbal or physical conduct of a
> sexual nature when:
> * * *
> - Such conduct has the purpose or effect of
>   unreasonably interfering with an individual's
>   work performance or creates an intimidating,
>   hostile, or offensive work environment.

AFP 36-2705 at 29 (28 February 1995).  The policy directive also states:  "Sexual harassment isn't about sex or healthy personal relationships.  It is an expression of <u>power</u> by

one individual over another that can be personally devastating to the recipient and others." Id. at 19. Having been placed on notice by Air Force policy as to what behavior was expected, was appellant on notice that his verbal and physical contact with 1Lt VC, Capt LK, and Capt TT was unwelcome?

I agree with the Chief Judge. In certain circumstances, a relationship may be of a nature that a comment or touching should be presumed to be unwelcome and contrary to service custom, even where the recipient is silent.[1] This is particularly likely to be the case where there is a difference in pay-grade between the recipient and protagonist of an unwelcome communication, or where there is a supervisory relationship between the two. 1Lt VC's testimony illustrates why recipients of unwelcome remarks may not overtly manifest their disapproval. Asked whether she had told anybody about appellant's touching during the CPR course, 1Lt VC responded: "No, I didn't. I was afraid to. I was new here. He was a captain; I was

---

[1] For all the reasons we have seen play out in this court-martial, the pamphlet also exhorts: "To help combat discrimination and sexual harassment in your work environment, never ignore the problem, speak up and seek help." AFP 36-2705 at 11. The pamphlet also contemplates any number of resolutions short of court-martial. Certainly, a court-martial is no substitute for good leadership.

2

just a second lieutenant. I didn't see him any more. I had no more contact with him. That's why." Again, when asked whether she had ever conveyed to appellant her view that his comments were unprofessional, 1Lt VC responded "No, I didn't. . . . I wanted – really, I didn't want to get involved, and he was my assistant supervisor, and I didn't feel comfortable reporting it."

Capt TT's testimony provides similar insight. Asked how appellant's actions made her feel, Capt TT responded: "Inferior. Like I was – I felt like I was a little lieutenant that was being touched by the captain that shouldn't have been." When asked why she did not say anything until March of 1996, Capt TT responded: "I didn't want to start a fuss. I was new there. I worked with all men. I didn't want to be the new female coming in starting a fuss. I didn't want my husband to know because I thought my husband might want to go confront him and do something that he maybe shouldn't."

Notwithstanding the majority opinion's conclusion that "the standard in the pamphlet does not require a recipient of sexual remarks to tell the speaker that the remarks were unwelcome," _MJ at (32), I disagree with the opinion's conclusion that appellant was "never told the remarks were

3

unwelcome" and, therefore, was not on notice the remarks were unwelcome.[2]

Appellant's additional conduct, and the reaction of 1Lt VC and Capts TT and LK to it should have fairly put appellant on notice that his verbal conduct was unwelcome. The Air Force pamphlet, if not the general norms of society, military or civilian, should have already put appellant on notice that this particular conduct was wrong and unbecoming an officer.

With respect to 1Lt VC, the majority opinion states that in response to appellant's verbal communication, appellant "touched her hair and the top of her kneecap. Other than moving away from his touch, she did not manifest concern about his remarks or conduct." __ MJ at (8) (emphasis added). What this text and the record make clear is that 1Lt VC made appellant aware that his remarks were unwelcome. She moved away.[3] Nowhere in the Air Force

---

[2] The majority opinion concludes that "[t]he record is clear that none of the nurses with whom appellant conversed advised him that his remarks were not welcome. On the contrary, the record reflects that his remarks usually produced a straightforward response or a response in kind, but he was never told that the remarks were unwelcome." __ MJ at (31).

[3] 1Lt VC's specific testimony was as follows: "Q: And when you claim Captain Brown touched your hair, did you move your head away from him so he couldn't do it any longer? A: I remember doing that. I have a tendency – I just don't like people touching my hair, and when someone comes up to touch my hair, I – I know I move my head because I've done that before. Q: And when you claim Captain Brown touched your knee, you moved your knee away from his hand, correct? A: Correct."

policy on sexual harassment does it require the victim of an offensive touch or word to specify in a given context which particular words or touchings were unwelcome.  A reasonable person would understand that moving away in response to physical and/or verbal contact is a signal that such contact is unwelcome.

The verbal charges pertaining to Capts TT and LK are closer cases, in part, because officers of the same grade should share fewer inhibitions about communicating their views to each other.  Restated, a reasonable person might well interpret silence differently when the person who is silent is an officer on an equal footing rather than an officer of subordinate grade.  In addition, when given an apparent opening to communicate her disapproval, Capt TT did not do so, as when appellant made the swimsuit comment in front to Lt Col B.

Nonetheless, applying the test for legal sufficiency expounded in Jackson, when viewed in a light most favorable to the Government, the evidence is such that a reasonable factfinder could have found all of the essential elements of proof beyond a reasonable doubt, and in particular, that appellant's comments were unwelcome and that he knew they were.  Moreover, the Jackson standard of review is particularly applicable where the demeanor of witnesses is

5

important in establishing credibility and critical testimonial phrases may be cryptic to the appellate eye.

In response to appellant's comment regarding how nice looking she was, Capt TT responded, "<u>I walked him off</u>. Just walked away." (Emphasis added.) Again, Capt TT stated, "The things that he said, I just – I didn't' want to make a scene. I didn't say anything. <u>I usually just walked him off</u>. . . . I didn't acknowledge to him it was okay. I think he knew I didn't like it. I – <u>when I would shrug my shoulder away and get up and walk away from him during a conversation, I think that was – I made my point</u>." (Emphasis added.)

Capt LK also communicated to appellant that his remarks and physical touching were unwelcome. When appellant said to Capt LK that he would come over to her house, she responded "Well, <u>what is your wife's name because I will call her and tell her</u> where to pick up her stray dog because I don't pick up strays." (Emphasis added.) When appellant touched the back of his hand to Capt LK's cheek, <u>she immediately walked away and backed up from him</u>. Only if we view appellant's statements as individual, isolated communications, without relation to what has gone before or what comes after, can it be said under <u>Jackson</u> that 1Lt VC, Capt TT, and Capt LK failed to

6

signal to appellant that his comments were unwelcome.  But they were not isolated.  A reasonable person, and a reasonable factfinder, could conclude that they were pervasive and they interfered with the work environment of 1Lt VC and Capts TT and LK.

Moreover, in the case of Capt TT, there was also a disparity in grade with appellant during much of the time-period in question.  Capt TT was not promoted to Captain until March 1996.  And as was made clear when the differences in instrument counting methodology were discussed, appellant remained Capt TT's assistant supervisor throughout the events in question.

Rightly wary of criminalizing the day-to-day fabric of life, the majority describes the wide range of comments that are likely to be made between officers in the Air Force.  The opinion illustrates this point with reference to a wide range of contexts involving interaction between officers.  But the contexts are all social (casual acquaintance through dating, courtship, and marriage), where one might reasonably expect some discussion of sex or sexual innuendo.  This is a case about whether comments made in the workplace -- an operating room -- as part of a professional relationship involving two officers of junior grade with whom appellant had a supervisory function, were

7

unwelcome, and if they were unwelcome, whether appellant's actions amounted to conduct unbecoming an officer.

Moreover, while the majority opinion cites to Air Force restrictions on dating between officers to illustrate the depth of relationships tolerated and accepted between officers of different grades, those same regulations also address more broadly unprofessional relationships between officers. The per se rule with respect to dating is limited to the same chain of command; however, the prohibition on unprofessional relationships extends to all personnel. AFI 36-2909 (1 May 1999), the successor to the Instruction cited in United States v. Rogers, 54 MJ 244 (2001), states in paragraph 3.3:

> **Dating and Close Friendships**. Dating, courtship, and close friendships between men and women are subject to the same policy considerations as are other relationships. Like any personal relationship, they become matters of official concern when they adversely affect morale, discipline, unit cohesion, respect for authority, or mission accomplishment. Members must recognize that these relationships can adversely affect morale and discipline, even when the members are not in the same chain of command or unit. The formation of such relationships between superiors and subordinates within the same chain of command or supervision is prohibited[.]

Like foxhole whispers, office banter is good for morale and unit cohesion. Likewise, humor can serve to promote mission accomplishment in the field, as well as in the operating room. However, sexual harassment is not a

8

component of esprit de corps or unit morale.  Officers should not confuse the two, particularly in the duty setting and particularly where the officer is on notice both as to expected behavior and that his remarks are unwelcome.