BAKER, Judge
(concurring in part and dissenting in part):
I concur with the majority’s handling of Issues I and II. On Issue III, I agree with the majority that this is a close case whose resolution revolves around the application of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), to specific facts. However, I disagree with the majority opinion’s conclusion and, therefore, dissent on Issue III. For the reasons that follow, I would affirm the court below with respect to the charges of verbal harassment, as well as those involving physical contact.
The Government has charged appellant with conduct unbecoming an officer based on persistent verbal comments in violation of Air Force policy on sexual harassment. As a result, the majority’s analysis rightly hinges on whether or not appellant was on notice that his verbal conduct was unwelcome. Air Force policy defines sexual harassment as [a] form of sex discrimination that involves unwelcomed sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:
$$$$$$
• Such conduct has the purpose or effect of unreasonably interfering with an individual’s work performance or creates an intimidating, hostile, or offensive work environment.
AFP 36-2705 at 29 (28 February 1995). The policy directive also states: “Sexual harassment isn’t about sex or healthy personal relationships. It is an expression of power by one individual over another that can be personally devastating to the recipient and others.” Id. at 19. Having been placed on notice by Air Force policy as to what behavior was expected, was appellant on notice that his verbal and physical contact with lLt VC, Capt LK, and Capt TT was unwelcome?
I agree with the Chief Judge. In certain circumstances, a relationship may be of a nature that a comment or touching should be presumed to be unwelcome and contrary to service custom, even where the recipient is silent.[1] This is particularly likely to be the case where there is a difference in pay-grade between the recipient and protagonist of an unwelcome communication, or where there is a supervisory relationship between the two. lLt VC’s testimony illustrates why recipients of unwelcome remarks may not overtly manifest their disapproval. Asked whether she had told anybody about appellant’s touching during the CPR course, lLt VC responded: “No, I didn’t. I was afraid to. I was new here. He was a captain; I was just a second lieutenant. I didn’t see him any more. I had no more contact with him. That’s why.” Again, when asked whether she had ever conveyed to appellant her view that his comments were unprofessional, lLt VC respond *393 ed “No, I didn’t____ I wanted — really, I didn’t want to get involved, and he was my assistant supervisor, and I didn’t feel comfortable reporting it.”
Capt TT’s testimony provides similar insight. Asked how appellant’s actions made her feel, Capt TT responded: “Inferior. Like I was — I felt like I was a little lieutenant that was being touched by the captain that shouldn’t have been.” When asked why she did not say anything until March of 1996, Capt TT responded: “I didn’t want to start a fuss. I was new there. I worked with all men. I didn’t want to be the-new female coming in starting a fuss. I didn’t want my husband to know because I thought my husband might want to go confront him and do something that he maybe shouldn’t.”
Notwithstanding the majority opinion’s conclusion that “the standard in the pamphlet does not require a recipient of sexual remarks to tell the speaker that the remarks were unwelcome,” 55 MJ at 386-87, I disagree with the opinion’s conclusion that appellant was “never told the remarks were unwelcome” and, therefore, was not on notice the remarks were unwelcome.[2]
Appellant’s additional conduct, and the reaction of ILt VC and Capts TT and LK to it should have fairly put appellant on notice that his verbal conduct was unwelcome. The Air Force pamphlet, if not the general norms of society, military or civilian, should have already put appellant on notice that this particular conduct was wrong and unbecoming an officer.
With respect to ILt VC, the majority opinion states that in response to appellant’s verbal communication, appellant “touched her ham and the top of her kneecap. Other than moving away from his touch, she did not manifest concern about his remarks or conduct.” 55 MJ at 378 (emphasis added). What this text and the record make clear is that ILt VC made appellant aware that his remarks were unwelcome. She moved away.[3] Nowhere in the Air Force policy on sexual harassment does it require the victim of an offensive touch or word to specify in a given context which particular words or touchings were unwelcome. A reasonable person would understand that moving away in response to physical and/or verbal contact is a signal that such contact is unwelcome.
The verbal charges pertaining to Capts TT and LK are closer cases, in part, because officers of the same grade should share fewer inhibitions about communicating their views to each other. Restated, a reasonable person might well interpret silence differently when the person who is silent is an officer on an equal footing rather than an officer of subordinate grade. In addition, when given an apparent opening to communicate her disapproval, Capt TT did not do so, as when appellant made the swimsuit comment in front to Lt Col B.
Nonetheless, applying the test for legal sufficiency expounded in Jackson, when viewed in a light most favorable to the Government, the evidence is such that a reasonable factfinder could have found all of the essential elements of proof beyond a reasonable doubt, and in particular, that appellant’s comments were unwelcome and that he knew they were. Moreover, the Jackson standard of review is particularly applicable where the demeanor of witnesses is important in establishing credibility and critical testimonial phrases may be cryptic to the appellate eye.
In response to appellant’s comment regarding how nice looking she was, Capt TT *394 responded, “/ walked him off. Just walked away.” (Emphasis added.) Again, Capt TT stated, “The things that he said, I just — I didn’t want to make a scene. I didn’t say anything. I usually just walked him off.... I didn’t acknowledge to him it was okay. I think he knew I didn’t like it. I — when I would shrug my shoulder away and get up and walk away from him during a conversation, I think that was — I made my point.” (Emphasis added.)
Capt LK also communicated to appellant that his remarks and physical touching were unwelcome. When appellant said to Capt LK that he would come over to her house, she responded “Well, what is your wife’s name because I will call her and tell her -frhere to pick up her stray dog because I don’t pick up strays.” (Emphasis added.) When appellant touched the back of his hand to Capt LK’s cheek, she immediately walked away and backed up from him. Only if we view appellant’s statements as individual, isolated communications, without relation to what has gone before or what comes after, can it be said under Jackson that lLt VC, Capt TT, and Capt LK failed to signal to appellant that his comments were unwelcome. But they were not isolated. A reasonable person, and a reasonable factfinder, could conclude that they were pervasive and they interfered with the work environment of lLt VC and Capts TT and LK.
Moreover, in the case of Capt TT, there was also a disparity in grade with appellant during much of the time-period in question. Capt TT was not promoted to Captain until March 1996. And as was made clear when the differences in instrument counting methodology were discussed, appellant remained Capt TT’s assistant supervisor throughout the events in question.
Rightly wary of criminalizing the day-today fabric of life, the majority describes the wide range of comments that are likely to be made between officers in the Air Force. The opinion illustrates this point with reference to a wide range of contexts involving interaction between officers. But the contexts are all social (casual acquaintance through dating, courtship, and marriage), where one might reasonably expect some discussion of sex or sexual innuendo. This is a case about whether comments made in the workplace— an operating room — as part of a professional relationship involving two officers of junior grade with whom appellant had a supervisory function, were unwelcome, and if they were unwelcome, whether appellant’s actions amounted to conduct unbecoming an officer.
Moreover, while the majority opinion cites to Air Force restrictions on dating between officers to illustrate the depth of relationships tolerated and accepted between officers of different grades, those same regulations also address more broadly unprofessional relationships between officers. The per se rule with respect to dating is limited to the same chain of command; however, the prohibition on unprofessional relationships extends to all personnel. AFI 36-2909 (1 May 1999), the successor to the Instruction cited in United States v. Rogers, 54 MJ 244 (2000), states in paragraph 3.3:
Dating and Close Friendships. Dating, courtship, and close friendships between men and women are subject to the same policy considerations as are other relationships. Like any personal relationship, they become matters of official concern when they adversely affect morale, discipline, unit cohesion, respect for authority, or mission accomplishment. Members must recognize that these relationships can adversely affect morale and discipline, even when the members are not in the same chain of command or unit. The formation of such relationships between superiors and subordinates within the same chain of command or supervision is prohibited!!]
Like foxhole whispers, office banter is good for morale and unit cohesion. Likewise, humor can serve to promote mission accomplishment in the field, as well as in the operating room. However, sexual harassment is not a component of esprit de corps or unit morale. Officers should not confuse the two, particularly in the duty setting and particularly where the officer is on notice both as to expected behavior and that his remarks are unwelcome.

. For all the reasons we have seen play out in this court-martial, the pamphlet also exhorts: "To help combat discrimination and sexual harassment in your work environment, never ignore the problem, speak up and seek help.” AFP 36-2705 at 11. The pamphlet also contemplates any number of resolutions short of court-martial. Certainly, a court-martial is no substitute for good leadership.

. The majority opinion concludes that "[t]he record is clear that none of the nurses with whom appellant conversed advised him that his remarks were not welcome. On the contrary, the record reflects that his remarks usually produced a straightforward response or a response in kind, but he was never told that the remarks were unwelcome.” 55 MJ at 386.

. ILt VC's specific testimony was as follows: "Q: And when you claim Captain Brown touched your hair, did you move your head away from him so he couldn’t do it any longer? A: I remember doing that. I have a tendency — I just don’t like people touching my hair, and when someone comes up to touch my hair, I — I know I move my head because I’ve done that before. Q: And when you claim Captain Brown touched your knee, you moved your knee away from his hand, correct? A: Correct.”